In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-2891

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES T. KINCANNON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 07 CR 30065—**Michael J. Reagan,** *Judge.*

ARGUED APRIL 10, 2009—DECIDED JUNE 8, 2009

Before BAUER, FLAUM, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* At 77 years old, James Kincannon makes for an unlikely methamphetamine dealer. But looks can be deceiving. Kincannon was convicted of conspiring to distribute and distributing methamphetamine after two controlled buys nailed him as a dope dealer. Kincannon was sentenced to 30 years in prison, and he now challenges his conviction on the conspiracy count and his sentence.

Curiously, Kincannon mounts no direct challenge to his conviction on the distribution charge for which he received a concurrent 30-year sentence.

Kincannon's demise began when a junkie, caught with a small amount of drugs, fingered Kincannon as a dealer and decided to cooperate with the police. The informant, who testified at trial, agreed to wear an audio and video wire while purchasing half an ounce of methamphetamine from Kincannon. He went to Kincannon's home for the buy, but, at that time, Kincannon only had a quarter ounce to sell. Kincannon asked the informant to stay put while he went to get more drugs, but didn't say where he was going. Police officers (some of whom also testified at trial) then followed Kincannon to the home of a woman named Cheryl Dill. The officers watched as Kincannon entered Dill's home, stayed briefly, and then left. Kincannon then returned to his home, where he consummated the drug deal—half an ounce for $1,100.

Five days later the officers set up a second controlled buy. Again, Kincannon didn't have enough to meet the informant's half-ounce order, so he asked the informant to wait while he fetched more drugs. This time, instead of heading straight to Dill's house, he stopped off at another location where he met Scott Thorburg. The officers were familiar with Thorburg, who had been arrested just eight months earlier. Kincannon then got into Thorburg's tow truck (he owned a tow yard) and Thorburg drove both of them to Dill's house. Thorburg waited in the car while Kincannon went inside to pick up the drugs. Thorburg then dropped Kincannon off at his car and they parted

ways. Shortly thereafter, both men were arrested following traffic stops. On Thorburg officers found two bags of methamphetamine, and on Kincannon they found an empty bag with methamphetamine residue, along with some of the prerecorded bills used in the first controlled buy. Kincannon was eventually indicted for distributing methamphetamine and conspiring to distribute methamphetamine with Dill, her supplier, and others "known and unknown." 21 U.S.C. §§ 841(a)(1), 846.

Thorburg, who testified at the trial, was no stranger to the drug trade. Once an engineer for ABC Sports who traveled across the country to film Monday Night Football, NASCAR, and PGA tournaments, he fell on hard times when he started using methamphetamine. As his use escalated, his life fell further into shambles; he eventually lost his job, divorced his wife, and took to selling drugs to support his own habit. In fact, Thorburg had been Kincannon's dealer for five or six months, until he got busted by the police. That arrest scared Thorburg enough that he quit dealing, but he was addicted to methamphetamine and needed a source for his personal fix. For that, he turned to Kincannon. At first, Kincannon charged $800 for half an ounce, but over time, the price rose to $1,000. Eventually, Thorburg began chauffeuring Kincannon to Dill's house. Thorburg testified that he did so on at least six occasions. Thorburg knew Dill by name, and Kincannon shared that he suspected Dill got the drugs from a jockey who lived in Kansas.

Dill also testified at the trial. She explained that she started selling methamphetamine at the suggestion of her

ex-boyfriend (and later, supplier), who was a jockey in Kansas. Her first sale was an eight-ball (3.5 grams) to a childhood friend. She asked her friend to introduce her to Kincannon because she needed someone who "got rid of drugs." The friend obliged, and Kincannon and Dill embarked on what turned out to be a short-lived business relationship. Over a six-week period Kincannon purchased at least 12 ounces of methamphetamine from Dill—a half an ounce to an ounce at a time on 15 different occasions. The terms of the transactions were standardized; Dill charged $900 for half an ounce and $1,800 for an ounce. She emphasized that Kincannon was to come to her home alone, saying "I told him I didn't want him to bring anybody to my house, that he was to come alone because I knew he was doing something illegal and I was afraid that—I didn't want to meet his customers and I didn't want them to know me." Dill did see someone in a tow truck—Thorburg—outside her home a half a dozen or so times. Kincannon explained that the man was his customer and left it at that. Thorburg never came inside Dill's home and Dill could not even identify his race or age.

At the close of the government's case (which also happened to be the end of all the evidence since Kincannon declined to present anything), Kincannon filed a motion for a judgment of acquittal, which the district court denied. The government's closing argument came next, during which the prosecutor made an analogy to an Academy-Award-winning movie: *The Godfather*. Recounting a pivotal scene where the director simultaneously presented assassinations orchestrated by the protagonist, Michael Corleone, the prosecutor explained that he, like the movie's director,

would attempt to seamlessly tell the "story of what happened" in this case. The prosecutor also recounted Thorburg's drug-fueled demise, noting that "it illustrates the power of this stuff and why we're on a serious purpose today in considering the charges against Mr. Kincannon." Eventually, the jury found Kincannon guilty on both the distribution and the conspiracy counts and rendered a special verdict, finding that the conspiracy involved 500 grams or more of methamphetamine.

At sentencing Kincannon made no objections to the proposed guidelines range of 360 months to life. Instead, he asked for a below-guidelines sentence, noting that, at 77 years old, a long term of imprisonment amounted to a life sentence. The district court rejected this request, pointing to Kincannon's propensity for criminal activity—he had a slew of prison convictions, and as the court noted, he had "done time in the State system, Illinois and Missouri, and in the Federal System." A 360-month sentence, the bottom of the guidelines range, was imposed on both counts of conviction.

Kincannon first argues on appeal that the district court erroneously denied his motion for a judgment of acquittal, claiming there was insufficient evidence to prove that he and Dill conspired together to distribute drugs. He claims that they only had a buyer-seller relationship. An agreement to exchange drugs for money (or something else of value)—the crux of the buyer-seller transaction—is insufficient to prove a conspiracy. *United States v. Colon*, 549 F.3d 565, 567-68 (7th Cir. 2008). That's because a conspiracy is more than an agreement, it's a knowing and intentional

agreement between two or more people to fulfill a particu-
lar criminal objective. The pact to sell drugs is itself a
substantive crime with no separate criminal aim and,
therefore, alone can add no conspiracy liability to the mix.
*United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en
banc) (plurality). Some evidence of an accord to commit
another crime on top of the drug sale is required; in this
case, we ask whether there is some evidence that
Kincannon agreed with someone else to the further distri-
bution of methamphetamine?

Kincannon claims that he had no such agreement with
Dill, and he has a point. Kincannon and Dill had a rela-
tively brief business relationship. Kincannon purchased
drugs from Dill—always in cash, on the barrelhead—over
a six-week period, 15 times total. Dill knew that Kincannon
was reselling the drugs, but that's not enough to prove a
conspiracy. That knowledge may or may not have made
Dill an aider and abettor to Kincannon's illicit activities,
but it does not make the two coconspirators because they
had no agreement to resell the methamphetamine to
anyone. *See Lechuga*, 994 F.2d at 349. What's more, Dill had
no personal investment in Kincannon's drug distribu-
tion—she had already been paid for the drugs. *See United
States v. Rock*, 370 F.3d 712, 715 (7th Cir. 2004) (affirming
conviction when defendant expected to be paid from the
resale of the drugs). In fact, she emphasized that she
wanted nothing to do with Kincannon's business or his
customers. The terms of their sales were standard-
ized—Kincannon paid $900 for a half ounce and $1,800 for
an ounce—but that says nothing about whether Dill agreed
to help Kincannon's distribution efforts. Regular purchases

on standard terms cannot transform a customer into a coconspirator. *United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) (crime of conspiracy cannot be equated with repeated transactions).

So far, this case is on all fours with our recent opinion in *Colon*. In *Colon*, the defendant was convicted of conspiring with his drug suppliers to possess cocaine with intent to sell. Colon, like Kincannon, repeatedly purchased drugs for resale from his suppliers over, at most, a six-week period. The terms, likewise, were standardized and the dealings were in cash. In *Colon*, the government contended that the prolonged, repeated, and standardized purchases of distribution quantities of drugs was enough to support the conviction. We disagreed. When stripped to its bare bones, the government's theory there, as it is here, "reduces to an assertion that a wholesale customer of a conspiracy is a co-conspirator per se," a position we did not embrace. *Id.* at 569.

Sensing the weight of *Colon*, the government attempts to distinguish Kincannon's case. It argues that Kincannon was more than just a customer, but that he also recruited other buyers—that is, Thorburg—for Dill, thereby throwing himself into her drug distribution ring. But this argument is not born out by the record. Throughout her testimony Dill identified Thorburg as *Kincannon's* customer, not her own. Likewise, Thorburg testified repeatedly that he bought drugs from *Kincannon*, not Dill. Dill never met Thorburg (she could not even identify his race), let alone establish the terms of the sales as she would have had to do with any other buyer. Thorburg confirmed that he never

went inside Dill's house. There is nothing in the record that even hints that Dill sought Kincannon's help in increasing her customer base, a particularly telling omission since it was just such a request to her first customer that led to her relationship with Kincannon. Dill knew how to network to get customers, and nothing suggests that she ever asked or received such help from Kincannon. Thorburg's purchases from Kincannon did mean, ultimately, that Dill could sell more drugs. But that minimal interest is no different for any seller who off-loads goods to a distributor, and we have already held that a wholesale customer and his suppliers are not necessarily in cahoots. *Colon*, 549 F.3d at 569.

This analysis, however, does not mean that we must reverse Kincannon's conviction. The indictment did not limit the conspiracy to Dill and Kincannon—the grand jury included "others known and unknown"—and the evidence does support the existence of a conspiracy between Kincannon and Thorburg. The fact that the indictment did not name Thorburg is irrelevant. *United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009) (proving conspiracy does not require the government to show that the defendant conspired with the individuals named in the indictment); *Lechuga*, 994 F.2d at 350, 352. "Others known and unknown" could have certainly included Thorburg, and there is no requirement that a conspiracy indictment identify uncharged coconspirators.

At trial, the government honed in on the alleged conspiracy between Dill and Kincannon, and Kincannon takes issue with the government's attention on appeal to his relationship with Thorburg. Kincannon argues that we are

precluded from considering his dealing with Thorburg, but cites no authority for this proposition. *Cf. Lechuga*, 994 F.3d at 350 (considering defendant's relationship with unnamed coconspirator, even though that relationship was not the focus of the trial or appeal). In any event, Thorburg testified at length about his relationship with Kincannon, and our job when evaluating the sufficiency of the evidence is to focus on the facts put before the jury. We must "view *all* the evidence and draw *all* reasonable inferences in the light most favorable to the prosecution and uphold the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004) (emphasis added) (quotations and citations omitted).

Kincannon's relationship to Thorburg was markedly different from his relationship with Dill. First, Thorburg and Kincannon dealt with each other for about a year. For months Kincannon was purchasing drugs from Thorburg. After Thorburg's initial arrest, he turned to Kincannon and they had, as he testified, "reverse roles." Kincannon began supplying Thorburg with drugs even before he met Dill. There was also a high level of trust between the two, which became evident once Kincannon started buying drugs from Dill. *United States v. Hach*, 162 F.3d 937, 943 (7th Cir. 1998) (noting that a demonstrated level of mutual trust is circumstantial evidence of a conspiracy). On at least six occasions, Thorburg drove Kincannon to Dill's house to pick up drugs. *United States v. Adkins*, 274 F.3d 444, 450 (7th Cir. 2001) (reasoning that traveling with coconspirator to purchase drugs supported conspiracy conviction). Kincannon did not

trust just anybody to accompany him. The confidential informant, on the two occasions he purchased drugs, was asked to stay at Kincannon's home while Kincannon went to Dill's to pick up the goods. What's more, Kincannon shared with Thorburg details about his business—revealing Dill's identity and address and explaining that he suspected Dill's supplier was a jockey from Kansas—a step he did not take with the informant.

Most importantly, there was a quid pro quo between Kincannon and Thorburg beyond the sale of the drugs. *Avila*, 557 F.3d at 816 ("The government need only show an agreement that goes beyond the *individual* sale between buyer and seller."). Because Thorburg drove to Dill's house, Kincannon got extra cover. Thorburg's car, not his own, would be seen by any officers who might be keeping watch over Dill's home. For taking on this risk, Thorburg got to purchase his drugs at a discount price. Thorburg testified that he paid anywhere from $800 to $1,000 for a half ounce of methamphetamine. Kincannon—who paid $900 for a half ounce—may have been charging Thorburg below or at-cost rates. Even at $1,000, Thorburg was paying $100 less than Kincannon's other customers, like the confidential informant. The jury could reasonably infer from this evidence that Thorburg and Kincannon agreed to more than just the individual drug purchases, but that they were cooperating to facilitate Kincannon's further drug distribution efforts.

There is one more wrinkle that we must address. The indictment accused Kincannon, and the jury, through a special verdict, found that the conspiracy involved 500

grams or more of methamphetamine. These types of indictments and special verdicts, of course, are standard after *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which requires the jury to find beyond a reasonable doubt any fact that raises the defendant's statutory maximum sentence. A defendant, like Kincannon, who has a prior felony drug conviction (covered by an information under 21 U.S.C. § 851), faces a mandatory minimum of 10 years in prison and up to a life sentence if at least 50 grams of a mixture containing methamphetamine is involved. If there is 500 grams or more involved, the statutory minimum is upped to 20 years. 21 U.S.C. § 841(b)(1)(A)(viii); (b)(1)(B)(viii). At trial, the government argued that the conspiracy included over 500 grams by aggregating the total amount of methamphetamine that Kincannon purchased from Dill (340.2 grams) with methamphetamine found at Dill's house (186 grams). But a coconspirator is only liable for transactions that were reasonably foreseeable acts in furtherance of the entire conspiracy, *United States v. Easter*, 553 F.3d 519, 523 (7th Cir. 2009), and since Dill was not part of the conspiracy, the drugs found at her place are arguably off limits.

But this possible *Apprendi* error is of little moment. The amount of methamphetamine involved in the conspiracy is not an element of the crime, so it has no effect on Kincannon's conviction. *United States v. Kelly*, 519 F.3d 355, 363 (7th Cir. 2008); *United States v. Gomez-Rosario*, 418 F.3d 90, 104 (1st Cir. 2005). The drug quantity amount is relevant for sentencing, but not all errors require remand since they are subject to harmless error analysis. *Adkins*, 274 F.3d at 454. And so long as the judge imposes a sentence below

the statutory maximum, he may do so based on facts found by a preponderance of the evidence. *United States v. Abdulahi*, 523 F.3d 757, 760 (7th Cir. 2008) (reiterating that *Apprendi* has no application to cases where the sentence is below the statutory maximum). On this record, it's clear, beyond a reasonable doubt, that a properly instructed jury would have found that Kincannon and Thorburg's conspiracy involved at least 50 grams of methamphetamine. That mark is met by just adding up the amount of drugs that Kincannon purchased when chauffeured by Thorburg. Thorburg testified that he drove Kincannon at least six times—a fact corroborated by Dill—and Dill added that Kincannon purchased either a half an ounce or an ounce on each trip (6 × .5 ounces = 85 grams). Kincannon was sentenced to 30 years imprisonment, well below the statutory maximum for conspiracies involving 50 grams or more of methamphetamine.[1]

Kincannon makes one more attack on his conviction. He argues, for the first time on appeal, that the prosecutor inflamed the passions of the jury, rendering the trial unfair, by referring in closing argument to *The Godfather* and Thorburg's precipitous decline once hooked on methamphetamine. Because the argument was forfeited before the district court, we review it only for plain error, and we

---

[1]   Interestingly enough, when calculating Kincannon's guidelines range, the probation officer included only the drugs that passed between Kincannon and Thorburg, an amount well below 500 grams. Neither party objected to the calculations, and the district court sentenced Kincannon according to the probation officer's recommendations.

begin by evaluating whether the comments themselves were improper. *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003).

The prosecutor's reference to *The Godfather* does not approach impropriety. It would be one thing if the government compared Kincannon to Michael Corleone, an organized crime kingpin responsible for murders and a whole host of other criminal activity. *See Alvarez v. McGinnis*, 4 F.3d 531, 534 (7th Cir. 1993). Such an analogy would be utterly unmoored from the record, which is probably why the government made no such connection. It was not Corleone's criminality, but Francis Ford Coppola's direction that was at the heart of the prosecutor's closing remarks. The prosecutor alluded to the pivotal point in the movie where Corleone attends his godchild's christening. Coppola cuts to various scenes of assassinations orchestrated by Corleone as a priest dubbed him the child's godfather. The poetic implication is that the murders, like the priest's liturgy, made Michael the godfather of the Corleone crime family. As the prosecutor said, "[n]ow that is how you present events that occur simultaneously in a movie so the viewer can understand it very easily." We agree, as did the Academy of Motion Picture Arts and Sciences, who nominated Coppola for an Oscar for best director.[2] The prosecutor explained to the jury that he would try to do orally what Coppola did in his

---

[2] In an upset along the lines of the 2009 Kentucky Derby win by Mine That Bird, the 1972 Oscar went to Bob Fosse (for *Cabaret*) rather than Coppola.

film—that is, tie together the events that occurred during the two controlled buys into one seamless story. To do so as eloquently as Coppola is a tall task, but there is certainly nothing improper about the attempt.

Likewise, the prosecutor's comments regarding Thorburg's life were not inappropriate. The description of Thorburg's drug-induced descent was rooted in his uncontroverted testimony, and the prosecutor highlighted it to "illustrate the power of this stuff and why we're on a serious purpose today in considering the charges against Mr. Kincannon." Impressing upon the jury the seriousness of the charges and commenting on the gravity of the drug problem in this country is permissible, *Bowman*, 353 F.3d at 551; *United States v. Zanin*, 831 F.2d 740, 743 (7th Cir. 1987), and the prosecutor did nothing more here.

We can also quickly dismiss Kincannon's last argument. He maintains that his within-guidelines sentence is unreasonable since, at 77 years old, 30 years of imprisonment amounts to a life sentence. During sentencing, Kincannon made a plea for a below-guidelines sentence based on his age. The court considered Kincannon's advanced age but noted that it had not deterred or slowed his criminal activity to date. Kincannon was in his fifties when his criminal record started and days away from his 73rd birthday when he was last released from prison after being popped for distributing drugs. Emphasizing the need for deterrence, the judge explained that Kincannon had "done time in the State system, Illinois and Missouri, and in the Federal system," yet "continued to sell the stuff," and sentenced him to the bottom of the guideline range. That

makes for a presumptively reasonable sentence on appeal. *Rita v. United States*, 551 U.S. 338 (2007); *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008). The court adequately explained the sentence it imposed and addressed Kincannon's request for lenience. *United States v. Wurzinger*, 467 F.3d 649, 654 (7th Cir. 2006) (affirming de facto life sentence where defendant had an above-average tendency to crime in his old age). Kincannon presents us with nothing to disturb the rebuttable presumption of reasonableness of his within-guidelines sentence.

Accordingly, the judgment of the district court is AFFIRMED.