In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1912

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIE EARL JOHNSON ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 980—**Blanche M. Manning**, *Judge.*

ARGUED DECEMBER 2, 2009—DECIDED JANUARY 19, 2010

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. We are called upon to articulate once again the distinction between a drug-distribution conspiracy and nonconspiratorial drug dealing. Willie Earl Johnson was convicted on several drug charges, including one count of conspiracy to possess and distribute crack cocaine. The government's case was based on wiretapped phone calls that captured conversations in which Johnson asked to purchase resale quantities

of drugs from his supplier Craig Venson or from one of Venson's associates.

As we explained in *United States v. Colon*, 549 F.3d 565 (7th Cir. 2008), and recently reiterated in *United States v. Kincannon*, 567 F.3d 893 (7th Cir. 2009), a drug purchaser does not enter into a conspiracy with his supplier simply by reselling the drugs to his own customers. A conspiracy requires more; it requires evidence that the buyer and seller entered into an "agreement to commit a crime other than the crime that consists of the sale itself." *Colon*, 549 F.3d at 569 (internal quotation marks omitted). The government therefore had to prove that Johnson and someone else entered into an agreement to distribute drugs, and this required evidence that is distinct from the agreement to complete the underlying wholesale drug transaction. Although the content of the intercepted phone calls suggested Johnson was a middleman who resold the drugs he purchased, that is all it suggested. As such, the evidence was insufficient to prove Johnson entered into a conspiracy to distribute drugs. We therefore vacate Johnson's conviction on the conspiracy count.

Johnson also contests his convictions for possession of cocaine with intent to distribute and using a telephone to facilitate the commission of a drug felony. We conclude there is sufficient evidence to affirm the jury's verdict on these counts. However, because Johnson's 72-month sentence hinged largely on his conspiracy conviction, we vacate the sentence and remand to the district court for resentencing on the remaining offenses.

## I. Background

Craig Venson was the kingpin of a major narcotics operation. He and his lieutenants were responsible for distributing copious quantities of crack cocaine and heroin in and around Aurora, Illinois, from approximately 2002 until 2005. In mid-2003 the FBI began investigating Venson's operation, and by 2004 the FBI had intercepted approximately 11,000 telephone conversations occurring on two of Venson's telephones. These telephone calls revealed significant drug trafficking and led to the arrests of Venson, Willie Johnson, and seven other individuals the government alleged were part of a conspiracy to distribute drugs.

The government indicted Johnson and the others on conspiracy and other drug charges, and seven of the alleged coconspirators, including Venson, pleaded guilty. This left only Johnson and Ismael Garza, two lower-level targets, to go to trial. Johnson and Garza were tried jointly as coconspirators, and a jury found both men guilty on all counts charged against them. Specifically, Johnson was convicted of conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Count One), possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) (Count Eleven), and using a telephone to facilitate a felony drug crime in violation of 21 U.S.C. § 843(b) (Count Twelve). Garza was similarly convicted on the conspiracy count and other lesser offenses. Because Garza played a greater role in Venson's drug empire, he received a 120-month sentence; Johnson was sentenced to 72 months' imprisonment.

Both Garza and Johnson appealed. While their appeals were pending, this court decided *Colon* and then *Kincannon*, both of which explained the nature of the proof required to convict a defendant for participating in a drug-distribution conspiracy. In light of these decisions, the government conceded that Garza's conspiracy conviction would not hold up on appeal and stipulated that it should be vacated. *See United States v. Garza*, No. 08-3005 (7th Cir. August 7, 2009) (order vacating & remanding); Joint Mot. to Summ. Vacate J. as to Count One, to Voluntarily Dismiss the Appeal, & to Remand for Resentencing, *United States v. Garza*, No. 08-3005 (7th Cir. July 22, 2009). The government did not take a similar view of Johnson's conspiracy conviction, however.

Invoking *Colon* and *Kincannon*, Johnson contends the evidence was insufficient to convict him of conspiracy. He argues in the alternative that trying him together with Garza violated his right to a fair trial and resulted in a fatal variance between the conspiracy alleged in the indictment and the proof offered at trial. He also contests the validity of his convictions on the lesser counts. Finally, he challenges the district court's sentencing findings regarding drug quantity.

Seventeen recorded phone calls allegedly linked Johnson to Venson's drug-distribution operation.[1] The phone calls included conversations between Johnson

---

[1] At the time of his arrest, Johnson did not possess any crack cocaine, guns, scales, or packaging material for narcotics. However, he did possess a small bag of marijuana.

and Venson, or Johnson and alleged coconspirator Tosumbua Parker (Venson's "right hand" man), in which Johnson asked Venson or Parker to supply him with "packs," "basketballs," or a "quarter pounder with cheese"—code words for crack-cocaine quantities. At trial Parker and FBI Special Agent Colluton testified that a "pack" referred to 1/16 of an ounce (1.75 grams) of crack, a "basketball" referred to 1/8 of an ounce (3.5 grams) of crack,[2] and a "quarter pounder with cheese" referred to 1/4 of an ounce (7 grams) of crack.[3] Other drug-code language was used as well. For example, in at least one

---

[2] Parker also testified that he and Venson cut the drug quantities to lesser amounts. Accordingly, a "pack" was cut from 1.5 to approximately 1.0 grams, and a "basketball" was cut from 3.5 to 3.0 grams. In calculating the total drug quantity attributed to Johnson as part of the conspiracy, the district judge accepted Parker's figures for "packs" but rejected his figures regarding "basketballs." Hence, one gram of crack was attributed to each "pack" sold, but 3.5 grams were attributed to each "basketball" sold. The judge's decision to split the difference was supported by Johnson's counsel, who conceded that 3.5 grams was an accurate number for each "basketball."

[3] Special Agent Colluton testified that while the term "pack" or "basketball" almost certainly referred to quantities of crack cocaine, the term "quarter pounder with cheese" was more ambiguous because both marijuana and crack cocaine are regularly sold in 1/4-ounce quantities. However, Parker testified that a "quarter pounder" referred to crack cocaine. At sentencing the district judge accepted Parker's testimony and attributed seven grams of crack for the "quarter pounder with cheese" Johnson asked to purchase from Venson in one particular phone call.

call, Johnson told his supplier he needed drugs because he had a "lick," meaning a customer.

Beyond these 17 phone calls, however, the government offered scant evidence inculpating Johnson in a conspiracy. Only two of the alleged coconspirators testified—Parker and April Hartline—and only Parker's testimony had anything to do with Johnson. In addition to explaining the meaning of the code words, Parker testified that he sold drugs to Johnson on no more than four occasions and that he never sold Johnson any drugs on credit. The only other items of evidence potentially linking Johnson to Venson's drug conspiracy were pen-register records showing 344 calls were placed between Johnson's and Venson's phones from December 2003 to October 2004. For about two months during this time period, the government monitored Venson's phones and recorded the conversations that were played at trial.

## II. Discussion

### A. Sufficiency of the Evidence: Conspiracy

Johnson contends there was insufficient evidence to support his conspiracy conviction. We will overturn a conviction on sufficiency-of-the-evidence grounds only if no rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Kincannon*, 567 F.3d at 898. In making this determination, we view all evidence and draw all reasonable inferences in the light most favorable to the prosecution. *See id.*

To convict a defendant of conspiracy, the government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement. *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). A drug-distribution conspiracy under 21 U.S.C. § 846 requires proof that the defendant knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs.[4] *Colon*, 549 F.3d at 569. When the alleged coconspirators are in a buyer-seller relationship, however, we have cautioned against conflating the underlying buy-sell agreement with the drug-distribution agreement that is alleged to form the basis of the charged conspiracy. To support a conspiracy conviction, there must be sufficient evidence of "'an agreement to commit a crime *other than* the crime that consists of the sale itself.'" *See id.* (quoting *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (en banc) (emphasis added)).

Articulating this principle is somewhat easier than applying it; it is often difficult to determine what proof is sufficient to establish that individuals in a buyer-seller relationship also agreed to distribute drugs. Certain characteristics inherent in any ongoing buyer-seller relationship will also generally suggest the existence of a conspiracy. For example, sales of large quantities of drugs, repeated and/or standardized transactions, and a

---

[4] Proof of an overt act is not required for drug conspiracies under 21 U.S.C. § 846. *United States v. Shabani*, 513 U.S. 10, 11 (1994).

prolonged relationship between the parties constitute circumstantial evidence of a conspiracy. *See, e.g., United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009); *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001); *United States v. Zarnes*, 33 F.3d 1454, 1465 (7th Cir. 1994). And ordinarily, the government may prove a conspiracy on circumstantial evidence alone. *Avila*, 557 F.3d at 815-16; *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991); *United States v. Redwine*, 715 F.2d 315, 320 (7th Cir. 1983) ("The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof.").

Yet we have routinely held that a conviction for conspiracy to distribute drugs cannot be sustained *solely* on circumstantial evidence if the evidence contains no basis for the jury to distinguish the alleged conspiracy from the underlying buyer-seller relationship. *See Colon*, 549 F.3d at 567 (evidence of standardized transactions, large quantities of drugs, and prolonged relationship between supplier and purchaser insufficient to sustain conspiracy conviction); *Lechuga*, 994 F.2d at 347 ("'large quantities of controlled substances, without more, cannot sustain a conspiracy conviction'" (quoting *United States v. Lamon*, 930 F.2d 1183, 1191 n.18 (7th Cir. 1991))). Thus, to prove a conspiracy, the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals.

This rule is based on a fundamental principle of criminal law: the requirement that the government prove the defendant guilty beyond a reasonable doubt. If the prosecution rests its case only on evidence that a buyer and seller traded in large quantities of drugs, used standardized transactions, and had a prolonged relationship, then the jury would have to choose between two equally plausible inferences. On one hand, the jury could infer that the purchaser and the supplier conspired to distribute drugs. On the other hand, the jury could infer that the purchaser was just a repeat wholesale customer of the supplier and that the two had not entered into an agreement to distribute drugs to others. In this situation, the evidence is essentially in equipoise; the plausibility of each inference is about the same, so the jury necessarily would have to entertain a reasonable doubt on the conspiracy charge. *See, e.g.*, *United States v. Lovern*, Nos. 08-3141 & 08-3149, 2009 WL 2871538, at *9 (10th Cir. Sept. 9, 2009) (When "the evidence . . . gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances a reasonable jury *must necessarily entertain* a reasonable doubt." (internal quotation marks omitted)); *O'Laughlin v. O'Brien*, 568 F.3d 287, 301 (1st Cir. 2009) (same); *United States v. Elashyi*, 554 F.3d 480, 492 (5th Cir. 2008) ("When the evidence is essentially in balance, a reasonable jury must necessarily entertain a reasonable doubt." (internal quotation marks omitted)); *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008) (same); *United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005) (same).

Absent some other evidence of a conspiratorial agree-
ment to tip the scales, the jury must acquit. Otherwise,
the law would make any "wholesale customer of a con-
spiracy . . . a co-conspirator per se." *Colon*, 549 F.3d at 569.

In *Colon* we gave the following examples of other evi-
dence that would distinguish a conspiracy from a
nonconspiratorial wholesale buyer-seller relationship:
sales on credit or consignment,[5] an agreement to look for

---

[5] A consignment sale that permits the middleman to return the
unused drugs is quintessential evidence of a conspiracy
because it shows that the supplier will not get paid until the
middleman resells the drugs. *See Lechuga*, 994 F.2d at 363
(Cudahy, J., concurring in part and dissenting in part).
Indeed, a consignment sale demonstrates a codependent joint
enterprise because neither party profits until the middleman
distributes the drugs to others. From this, a jury could easily
infer an agreement to distribute. Credit sales are different; not
all credit sales can support an inference that there was an
agreement to distribute. For example, a supplier extending
credit to an individual buying a small quantity of drugs for
personal consumption does not create a conspiracy. *See id.*; *cf.*
*United States v. Baker*, 905 F.2d 1100, 1106 (7th Cir. 1990) (one-
time credit purchase of large quantity of drugs not evidence
of a conspiracy). However, when a credit sale is coupled
with certain characteristics inherent in an ongoing wholesale
buyer-seller relationship—i.e., large quantities of drugs, "repeat
purchases or some other enduring arrangement"—the credit
sale becomes sufficient evidence to distinguish a conspiracy
from a nonconspiratorial buyer-seller relationship. *See Baker*,
905 F.2d at 1106. In this situation, the credit arrangement could
(continued...)

other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities. *See id.* at 568-70.

Recognizing that the validity of Johnson's conspiracy conviction depends on evidence of this sort, the government argues that it proved: (1) Venson sold drugs to Johnson on credit; (2) Johnson looked for customers for Venson; and (3) Johnson warned Venson of a police presence. The record, however, does not support this characterization of the evidence.

The government's first two contentions—that there were sales on credit and Johnson agreed to find customers for Venson—rest entirely on a July 2, 2009 phone conversation in which Johnson asked for a discount on the price of the drugs he was ordering from Venson. Johnson called Parker and asked if he could get five "packs" (of crack) for the price of four, a $30 discount. Hearing this, Venson grabbed the phone from Parker and asked if Johnson was "high." Venson then said he would agree only if Johnson paid the $30 later. Johnson rejected this counteroffer and persisted in his attempt to secure a $30 discount. Johnson reminded Venson that

---

[5] (...continued)
easily "support an inference that [the buyer] became a co-venturer" because he will not got paid until the drugs are resold. *Id.*

he would continue to do business with him and indicated that he had a friend who wanted to buy drugs from Venson.[6] Venson then relented and agreed to the five-for-four deal.

The government argues that this evidence established a conspiracy because it showed both that Venson sold drugs to Johnson on credit and that Johnson agreed to find more customers for Venson to further the joint enterprise. *See Colon*, 549 F. 3d at 570 (explaining that the sale of drugs on credit and an agreement to find new customers may constitute evidence of a conspiracy to distribute). This interpretation is quite strained. For starters, Johnson did not buy drugs on credit because he never agreed to repay Venson the $30. Johnson got a discount, not an advance. The government suggests in the alternative that a discount is evidence of a conspiracy because it shows that Venson and Johnson "shared a financial interest in arranging customers for Venson's drugs, and Venson's price cut was designed to encourage [Johnson] to augment Venson's market." This is more weight than a one-time $30 discount can bear. As a general matter, every buyer-seller transaction involves a "shared financial interest" in the sense that each party exchanges something of value. Here, Venson apparently thought Johnson's continued business and the

---

[6] Johnson's actual response was littered with profanity and difficult to comprehend. However, both parties agree that Johnson's response indicated he was promising to buy his drugs from Venson in the future and promising to refer a friend to Venson.

possibility of a referral was worth the $30 discount, but that hardly suggests the two agreed to a drug-distribution venture. Rather, Johnson traded on his status as a regular customer and promise of a referral in order to secure a one-time discount on the price of the drugs and to consummate the transaction immediately. Importantly, Johnson did not agree to *recruit* new customers for Venson, but simply said he had a friend who needed a drug supplier. *Cf. id.* (agreement to look for new customers can be evidence of conspiracy). In short, the July 2 conversation is insufficient to establish that Johnson and Venson had an agreement to distribute drugs that was distinct from the agreement to complete the underlying drug deal.

The government's third and final contention is that Johnson warned Venson of a police presence in the neighborhood and that this is distinguishing evidence of a conspiracy. On August 31, 2004, Johnson called Venson and ordered a "quarter pounder with cheese." While Venson was en route to deliver the drugs, Johnson again called Venson and told him the police were in the area. Like the one-time discount, this singular warning is insufficient to establish the existence of a conspiracy. Johnson warned Venson because he was waiting for Venson to deliver the drugs he had just ordered. Venson was in the car and was just arriving at the spot where he planned to hand over the drugs; in this situation, any ordinary drug purchaser would warn his supplier of a nearby police presence to ensure he received the delivery. This is not conspiratorial behavior; it is self-preservation.

The rest of the government's case consisted of the sort of generic circumstantial evidence that is inherent in any wholesale buyer-seller relationship.[7] For example, there is evidence Johnson repeatedly purchased drugs in standardized quantities and then resold the drugs to his customers. Moreover, the large volume of phone calls between Johnson and Venson (approximately 300 calls over 10 months) established a prolonged relationship of mutual trust. But as we explained in *Colon*, this kind of evidence typifies a nonconspiratorial wholesale buyer-seller relationship. *See id.* (explaining that some level of mutual trust is inherent in any buyer-seller relationship). The jury had no evidence before it other than that which is routinely present in an ongoing buyer-seller relationship. As such, the evidence is insufficient to support Johnson's conspiracy conviction.[8]

---

[7] At oral argument the government disclaimed any reliance on evidence of an unexplained trip Johnson, Parker, and Venson took to Iowa in 2003. Parker testified that the three traveled to Iowa and while there Johnson sold a small quantity of drugs to some of Venson's family members. The purpose of the Iowa trip is unclear from the record, as are the circumstances surrounding the drug transaction. In light of the government's disclaimer, however, we need not consider this ambiguous evidence any further.

[8] As we have noted, Johnson also contends his conviction should be overturned because there was a fatal variance between the conspiracy alleged in the indictment and the proof offered at trial. *See Townsend*, 924 F.2d at 1389. In particu-

(continued...)

Our conclusion necessarily means that no reasonable jury could have convicted Johnson of a conspiracy on these facts, *see Kincannon*, 567 F.3d at 898, but we note the jury received the same conspiracy instructions we said in *Colon* were "muddle[d]," 549 F.3d at 570-71. Johnson's jury was told to consider the following factors: (1) whether the transactions involved large quantities of crack; (2) whether the parties had a standardized way of doing business over time; (3) whether the sales were on credit or consignment; (4) whether the parties had a continuing relationship; (5) whether the seller had a financial stake in a resale to the buyer; and (6) whether the parties had an understanding that the drugs would be resold. As we explained in *Colon,* only the third of these factors—sales on credit or consignment—actually distinguishes a conspiracy from a nonconspiratorial wholesale buyer-seller relationship. *Id.* at 570. The remaining factors are pertinent only if the government has offered some evidence from which the jury can distinguish a conspiracy from a mere buyer-seller relationship. *Id.* Where the government has offered *some* distinguishing evidence, the jury may rely on the other

---

[8] (...continued)

lar, he claims he was prejudiced by being tried jointly with Garza because the jury heard numerous wiretapped phone calls involving discussions between Garza and other alleged coconspirators or discussions between the alleged coconspirators who were not on trial. Because we are vacating Johnson's conspiracy conviction on sufficiency-of-the-evidence grounds, we need not consider this argument.

factors listed in the instruction to buttress an inference that there was an agreement to distribute drugs. But in the absence of other evidence, the presence of the remaining factors suggests only a nonconspiratorial wholesale buyer-seller relationship and will not support a conspiracy conviction.

## B.  Sufficiency of the Evidence: Remaining Counts

Johnson also challenges the sufficiency of the evidence supporting his convictions for possession of cocaine with intent to distribute and using a telephone to facilitate a drug felony. On the possession count, the jury concluded that on or about July 2, 2004, Johnson possessed with intent to distribute a controlled substance containing cocaine. We will sustain this conviction if a reasonable jury could conclude from the evidence that Johnson (1) knowingly and intentionally possessed cocaine, (2) with intent to distribute it, (3) while knowing it was a controlled substance. *United States v. Irby*, 558 F.3d 651, 654 (7th Cir. 2009). A jury may infer that the defendant actually or constructively possessed drugs from circumstantial evidence alone. *See United States v. Morris*, 576 F.3d 661, 666-69 (7th Cir. 2009).

The July 2, 2004 phone intercepts, along with other record evidence, support a reasonable inference that Johnson possessed cocaine with intent to distribute. The phone intercepts begin on the evening of July 2 with the recording we have already described, which captures Johnson attempting to secure a $30 discount on the price of five "packs" of crack. This recording starts with

Johnson telling an unidentified male in the background that he would try to get the "buy four, get five" deal. After haggling back and forth, Venson agreed to the discount. About three hours later, at 11:22 p.m., Johnson called Venson back and complained about the delay in delivery. During this call, Johnson interrupted his conversation with Venson to speak to the unidentified male. Johnson asked the man what he wanted, and the man responded, "a basketball." Johnson then ordered a "basketball" from Venson, and Venson said he would deliver it in 15 minutes.

A third phone call about an hour later is circumstantial evidence that Johnson actually received the requested cocaine. At 12:19 a.m. Johnson called Venson and told him the drugs were "phat"—that is, they were of high quality. This supports an inference that Johnson received—and therefore possessed—the crack he had previously ordered. Other wiretaps corroborated the inference that Johnson intended to distribute the drugs he purchased from Venson. For instance, on August 14, 2004, Johnson called Venson and asked for a "basketball" because he had a "lick" (meaning a customer) coming over in 15 minutes. Although Johnson's possession conviction was based on his activities of July 2, 2009, the jury reasonably could rely on this August 14 call to reinforce a conclusion that Johnson's purchase on July 2 was for resale. All in all, there is sufficient evidence to support Johnson's conviction for possession of cocaine with intent to distribute.

We also conclude the evidence is sufficient to sustain Johnson's conviction for using a telephone to facilitate a

drug felony in violation of 21 U.S.C. § 843(b). To convict on this count, the government had to prove that Johnson knowingly or intentionally used a telephone to further a felony drug crime and that the felony indeed occurred. *See United States v. McGee*, 408 F.3d 966, 985-86 (7th Cir. 2005). There is no dispute here about Johnson's use of a telephone. The indictment alleged that Johnson used the telephone to further two separate crimes—the conspiracy (Count One) and possession with intent to distribute (Count Eleven). Although we have vacated the conspiracy conviction, the possession conviction still stands, and it supports Johnson's conviction on the use-of-a-telephone count.

## C.  Sentencing

Johnson was sentenced to 72 months' imprisonment for his convictions on the conspiracy and possession counts, and 48 months' imprisonment for his conviction on the use-of-the-telephone count, with the terms running concurrently. This sentence was plainly driven by the conspiracy charge. The jury returned a special verdict finding Johnson accountable for between 5 and 50 grams of crack cocaine based on his involvement in the conspiracy. At sentencing the district judge assessed Johnson's drug quantity more specifically at 31.5 grams of crack cocaine and used this figure to calculate his advisory sentencing range under the Sentencing Guidelines. But now the conspiracy conviction is vacated, and gone with it is the jury's special verdict assigning a quantity of 5 to 50 grams of crack cocaine. All that remains

is a conviction for possession (with no special verdict assigning a drug quantity) and a conviction for using a telephone to further that felony. Johnson is therefore entitled to resentencing.

   Accordingly, we VACATE Johnson's conspiracy conviction and his sentence, AFFIRM the remaining convictions, and REMAND for resentencing.