NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted February 10, 2010
Decided February 12, 2010

**Before**

RICHARD A. POSNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 09-1208

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 3:08CR30055-006-GPM |
| KENNETH V. THOMAS, *Defendant-Appellant.* | G. Patrick Murphy, *Judge.* |

**O R D E R**

Following a two-day jury trial at which he represented himself, Kenneth Thomas was convicted of conspiracy to distribute and possess with intent to distribute cocaine and marijuana, 21 U.S.C. §§ 846, 841(a)(1), and possession with intent to distribute crack cocaine, *id.* § 841(a)(1). The district court sentenced him within the guidelines imprisonment range to a total of 300 months. Thomas appeals, but his appointed lawyers seek to withdraw under *Anders v. California*, 386 U.S. 738 (1967), because they conclude that the appeal is frivolous. Thomas opposes counsel's motion. *See* CIR. R. 51(b). We confine our review to the potential issues identified in counsel's facially adequate brief and Thomas's response. *See United States v. Schuh*, 289 F.3d 968, 973-74 (7th Cir. 2002).

Thomas first landed on the government's radar in July 2007, when an informant fingered him as a drug dealer. During a recorded phone call, the informant arranged to buy crack from Thomas at his house in East St. Louis, Illinois. DEA agents then orchestrated a controlled buy at the residence, followed by three more over the following two months. Those transactions supplied the probable cause for a warrant to search Thomas's home. Before executing that warrant, the agents arrested Thomas at his parole office and, after giving him *Miranda* warnings, escorted him to the house, where they found marijuana, a hat concealing a baggy with 12.3 grams of crack, sandwich bags typically used to package drugs, a safe, and a digital scale with crack residue on it. Agents also discovered that the house was monitored by a surveillance system.

After the search Thomas accompanied the agents to their office. Once there he received fresh *Miranda* warnings and made a series of incriminating admissions. According to the testimony of the agents at trial, Thomas admitted that, between May and July 2007, he "brokered" a total of approximately 30 kilograms of cocaine for a man named Don Johnson. (The agents did not say whether Thomas elaborated on how or with whom he brokered the deals.) Thomas added that he also laundered money for Johnson. Johnson had given him $15,500 in currency to deposit incrementally into the bank account of a third man, though he succeeded in depositing only $12,000 before bank employees became suspicious. According to the agents, Thomas volunteered his dealings with Johnson, apparently because he hoped to exchange his cooperation for favorable consideration down the line.

During the interview Thomas also volunteered that the crack seized from his home was supplied by another dealer named Fontez Combs. He said he bought roughly 2.5 kilograms of crack and powder cocaine from Combs over the previous three months, as well as roughly 1.5 kilograms of cocaine from yet another dealer named Fred Rayford.

After agreeing to cooperate with the agents, Thomas was released, but the deal was short-lived. The agents first hoped that he could help them snare Combs (who was known to be a large-scale dealer), but Combs, apparently aware of the trap, would have nothing to do with Thomas. Later that month Thomas notified one of the agents, Chris Mueth, that Rayford had just received a shipment of cocaine and was seeking buyers. The next day, though, Thomas abruptly called the agent and reported that Rayford had come to his house the night before and dropped off a quantity of crack that weighed 164 grams. With the agents watching, Thomas set up a meeting with Rayford, ostensibly to pay him for the crack, but it quickly became clear—as the agents already suspected—that Rayford had not been the source of the drugs. Thomas's cooperation agreement was terminated, and he was arrested again in March 2008.

	The basis of the government's conspiracy charge was Thomas's involvement with Don Johnson.  By his own admission, Thomas had brokered multiple cocaine sales for Johnson in the spring and summer of 2007.  Johnson, who was charged for his role in a broader conspiracy with roots in Mexico, testified against Thomas as part of a cooperation agreement with the government.  Johnson for the most part confirmed Thomas's admissions, though he did not characterize Thomas as a broker.  Instead he described Thomas as his sole distributor.  Johnson testified that he had fronted Thomas, one kilogram at a time, about 39 kilograms of cocaine (not 30 kilograms, as Thomas had told the agents).  He also added that, in addition to cocaine, he fronted Thomas between 40 and 120 pounds of marijuana, one pound at a time, in the early part of 2007.  The jury found Thomas guilty of conspiracy to distribute and possess with intent to distribute cocaine and marijuana and returned a special verdict finding that the conspiracy involved at least five kilograms of cocaine.  The jury also found Thomas guilty of possession with intent to distribute crack, based on the crack uncovered during the search of his home.

	In their *Anders* submission, counsel first consider whether Thomas might challenge the district court's decision to permit him to represent himself at trial, a decision we would review for abuse of discretion.  *See United States v. Berry*, 565 F.3d 385, 389 (7th Cir. 2009).  A criminal defendant may waive his right to counsel and proceed pro se so long as the waiver is knowing and intelligent.  *United States v. Johnson*, 534 F.3d 690, 693-94 (7th Cir. 2008); *United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000).  Although there is no formal checklist of warnings, the defendant must "be made aware of the dangers and disadvantages of self-representation"so that "his choice is made with eyes open."  *Faretta v. California*, 422 U.S. 806, 835 (1975) (internal quotation marks and citation omitted).  To determine whether Thomas made an informed choice to represent himself, we would consider (1) whether and to what extent the district court conducted a formal hearing on the issue, (2) other evidence in the record that establishes whether Thomas understood the risks of self-representation, (3) Thomas's background and experience, and (4) the context of Thomas's decision.  *See United States v. Alden*, 527 F.3d 653, 660 (7th Cir. 2008); *United States v. England*, 507 F.3d 581, 586 (7th Cir. 2007).

	We agree with counsel that it would be frivolous for Thomas to challenge the district court's decision to permit him to proceed pro se.  The court conducted a hearing on Thomas's request to represent himself and thoroughly admonished Thomas about the dangers of self-representation.  The court warned Thomas about the complexity of federal conspiracy law, alerted him that the proceedings would differ from those he had experienced in state court, and cautioned him that being incarcerated might impede his access to discovery.  The court suggested that Thomas would likely fare much better with the assistance of his attorney, whom the district judge regarded as "one of the most accomplished lawyers" in the pool of court-appointed counsel.  The court inquired about

Thomas's educational background, and Thomas reported that he had studied criminal justice for two years at a community college, earning a B average. He also has an extensive criminal history including more than a dozen arrests and state prosecutions since 1980, and he told the court he was once acquitted by a state jury. Although the court might have pressed Thomas further on his motivation for waiving counsel—Thomas explained only that his attorney had not spent enough time discussing the case with him and would give him information about only two of his codefendants—the court's warnings, combined with Thomas's extensive exposure to the criminal-justice system, would satisfy us that he understood the serious nature of the proceedings and the risks of representing himself. *See Johnson*, 534 F.3d at 694; *United States v. Todd*, 424 F.3d 525, 533 (7th Cir. 2005).

Counsel next evaluate whether Thomas could raise a nonfrivolous challenge to the district court's evidentiary rulings. Counsel first consider whether Thomas could contest the adverse ruling on his motion to suppress the incriminating statements he made to the DEA agents after his arrest—statements that put the agents on notice of Thomas's involvement with Johnson and served as the basis for the conspiracy charge. At the hearing on Thomas's motion, Agent Mueth testified that he gave *Miranda* warnings when Thomas was first arrested and again after Thomas accompanied the agents back to their office following the search of his home. Before speaking to the agents, Thomas initialed and signed a written *Miranda* waiver, which the government introduced at the hearing. Thomas did not cross-examine Mueth or offer any testimony of his own to cast doubt on the voluntariness of his statements; he argued only that Mueth's testimony was "hearsay" and insisted that he never spoke at all to Mueth about drug activity. In short, Thomas's contention was that Mueth was lying about the *extent* and *content* of the postarrest interview; he was not contending that the interview was compelled or involuntary. We thus agree with counsel that any challenge to the district court's decision to admit his postarrest statements would be frivolous.

Counsel next consider whether Thomas could challenge the district court's refusal to subpoena Louis McCottrell, another player in the larger conspiracy. The Sixth Amendment guarantees a criminal defendant the right to compulsory process to secure the appearance at trial of a witness whose testimony would be "material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *see also* FED. R. CRIM. P. 17(b) (providing that district court must subpoena witness for indigent defendant if necessary to "an adequate defense"). McCottrell initially was a rung above Don Johnson on the conspiracy's ladder. McCottrell received shipments of cocaine and marijuana from a supplier in Mexico, which Johnson offloaded and stored for him until McCottrell's arrest in December 2006. After that, Johnson began receiving drugs directly from the supplier. But McCottrell had pleaded guilty to drug-conspiracy charges in February 2007, three months before Thomas began receiving cocaine from Johnson, and the government represented that it would not be

calling McCottrell as a witness because his involvement with Thomas was too remote to be relevant in this case. Thomas offered an indecipherable explanation as to how McCottrell's testimony could help him, and thus we agree with counsel that it would be frivolous to assert that the district court abused its discretion in declining to subpoena McCottrell. *See United States v. Williamson*, 202 F.3d 974, 978-80 (7th Cir. 2000).

It would also be frivolous to renew any of Thomas's evidentiary objections at trial. Thomas repeatedly objected on hearsay grounds to the agents' testimony recounting his postarrest statements, but these objections were unfounded because a defendant's admissions are not hearsay when offered against him. *See* FED. R. EVID. 801(d)(2)(A); *United States v. Simpson*, 479 F.3d 492, 502 n.2 (7th Cir. 2007). Also unfounded was Thomas's objection when the court permitted Agent Mueth to identify Thomas's voice on a telephone recording introduced by the government. Thomas challenged the authentication of the recording on the ground that Mueth is not an expert in voice identification, but lay-opinion testimony is acceptable to establish a speaker's identity, and Mueth's extensive contact with Thomas gave him the requisite familiarity with Thomas's voice to identify it. *See* FED. R. EVID. 901(b)(5); FED. R. EVID. 901(b) advisory committee's note Example (5); *United States v. Recendiz*, 557 F.3d 511, 527 (7th Cir.), *cert. denied*, 130 S. Ct. 340 (2009). Thomas's remaining evidentiary objections were so frivolous as not to require any further discussion.

Next, counsel evaluate whether Thomas could argue that the government constructively amended the indictment because the evidence at trial centered on a period of time shorter than that alleged in the indictment. Thomas did not raise this argument in the district court, so we would review only for plain error. *See United States v. Presbitero*, 569 F.3d 691, 698 (7th Cir. 2009). A constructive amendment occurs when the permissible bases for conviction are broadened beyond those presented to the grand jury. *United States v. Blanchard*, 542 F.3d 1133, 1143 (7th Cir. 2008). Here, the indictment charged a conspiracy between Thomas and Johnson running from August 2005 until October 2007, but the government's evidence did not establish any dealings between the two men until 2007. What that means, however, is that Thomas's involvement in the conspiracy was *narrower*, not broader, than what was charged in the indictment, and thus there could not have been a constructive amendment. *See United States v. Thomas*, 520 F.3d 729, 734 (7th Cir. 2008); *United States v. Duff*, 76 F.3d 122, 126 (7th Cir. 1996). Counsel contemplates recasting the argument as one that there was a "fatal variance" between the indictment and the evidence produced at trial, but the argument is frivolous under any label. *See Blanchard*, 542 F.3d at 1142-43; *United States v. Bolivar*, 532 F.3d 599, 604 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 962 (2009).

Counsel next evaluate whether Thomas could challenge the sufficiency of the evidence underlying his convictions. Although Thomas filed a motion for a judgment of

acquittal, *see* FED. R. CRIM. P. 29(c), he did not supply any particular reason why the evidence is insufficient. Indeed, the evidence supporting Thomas's conviction for possession with intent to distribute crack cocaine is overwhelming. The government introduced evidence that a confidential informant purchased crack out of Thomas's home on four occasions over a two-month period, that agents later uncovered at his home 12.3 grams of crack and common tools of the drug trade, and that Thomas admitted the drugs were his. Although Thomas attempted to cast doubt at trial about whether he lived in the house, his own witnesses—including his father and a neighbor—testified that Thomas lived there alone in 2007.

Any challenge to the sufficiency of the evidence supporting the conspiracy conviction would also be frivolous. A wholesale customer of a conspiracy is not necessarily a coconspirator, and we repeatedly have cautioned against conflating buyer-seller transactions with conspiracy. *United States v. Johnson*, No. 09-1912, 2010 WL 154798, at *3-4 (7th Cir. Jan. 19, 2010); *United States v. Kincannon*, 567 F.3d 893, 897 (7th Cir. 2009); *United States v. Colon*, 549 F.3d 565, 567-69 (7th Cir. 2008). A drug-conspiracy conviction requires proof of an agreement to commit some other crime on top of the drug sale, and thus evidence of standardized transactions, large quantities of drugs, and an ongoing relationship between buyer and seller is, without more, insufficient to sustain a conviction. *See Johnson*, 2010 WL 154798, at *4; *Colon*, 549 F.3d at 567-68. We have explained, however, that a consignment sale permitting the middleman to return unsold drugs is "quintessential evidence of a conspiracy because it shows that the supplier will not get paid until the middleman resells the drugs." *Johnson*, 2010 WL 154798, at *4 n.5. For the same reason, evidence of sales on credit coupled with large quantities of drugs, repeat purchases, or "'some other enduring arrangement'" is sufficient to distinguish a conspiracy from a nonconspiratorial buyer-seller relationship. *Id.* (quoting *United States v. Baker*, 905 F.2d 1100, 1106 (7th Cir. 1990)).

The evidence at trial was that Johnson provided large quantities of marijuana and cocaine to Thomas in a series of at least 70 standardized transactions. Johnson testified that, when he received a 10-kilogram shipment of cocaine, he "immediately gave Mr. Thomas one of the kilos" and then Thomas "went out, sold it, brought the money back and he received the other nine in increments of one kilogram per transaction." Whether this method of supplying drugs can be described more fairly as "on consignment" or "on credit" is unclear—Johnson testified that Thomas never had difficulty getting rid of the drugs, and so we do not know what would have happened had he tried to return them unsold. And, according to the uncontested testimony of the agents at trial, Thomas actually characterized his role as that of broker. In any event, the arrangement between Thomas and Johnson sufficiently supports an inference that the men were co-venturers in the distribution of the drugs. Johnson testified that Thomas was his sole cocaine distributor, demonstrating trust

and his complete reliance on Thomas to see any proceeds from the sale of the drugs. *See Johnson*, 2010 WL 154798, at *4 n.5; *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007). Further, the government's case included evidence that Johnson gave Thomas $15,500 in currency—proceeds from drug transactions—to deposit into a bank account, demonstrating a mutual trust between the men suggestive of much more than a buyer-seller relationship. *See Colon*, 549 F.3d at 567-68. We thus agree with counsel that it would be frivolous to argue that, on these facts, no rational jury could find Thomas guilty of conspiracy beyond a reasonable doubt. *See United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009), *cert. denied*, 2010 WL 251511 (U.S. Jan. 25, 2010).

Finally, counsel consider whether Thomas could challenge his prison sentence. Counsel first ask whether Thomas could dispute the district court's guidelines calculations. In the presentence investigation report, the probation officer recommended finding Thomas responsible for 228.7 grams of crack cocaine and 39.5 kilograms of powder cocaine. The probation officer converted these amounts to their marijuana equivalents, *see* U.S.S.G. § 2D1.1, cmt. 10(B), (D), (E), for a total of 12,474 kilograms of marijuana, which produced a base offense level of 34. The district court adopted the recommendation.

Thomas objected to the drug-quantity calculation, but we agree with counsel that it would be frivolous to renew the argument on appeal. The basis of Thomas's conviction for possession with intent to distribute crack was the 12.3 grams of crack that were discovered during the search of his home, and the basis of the conspiracy conviction was the 35.5 kilograms of crack he sold for Don Johnson. (Thomas admitted to 30 kilograms, but Johnson testified that the amount was slightly more than 39 kilograms. The district court settled on an estimate of 35.5 kilograms.) Although the district court did not make an explicit finding that the remaining uncharged quantities of crack and powder cocaine were sufficiently related to the offenses of conviction, relevant conduct may be used in calculating the base offense level if it is part of the same "common scheme or plan" or "course of conduct" that gave rise to the defendant's conviction and is established by a preponderance of the evidence. *See United States v. Farmer*, 543 F.3d 363, 373 (7th Cir. 2008); *United States v. Wilson*, 502 F.3d 718, 721-22 (7th Cir. 2007). Here, agents orchestrated four controlled buys of a total of 52.4 grams of crack in the two months preceding the search of Thomas's home. Thomas also later turned over 164 grams of crack to the agents under suspicious circumstances, and he reported to the agents that he had recently purchased 1.5 and 2.5 kilograms of cocaine, respectively, from Fred Rayford and Fontez Combs. This evidence was enough for the district court to conclude that Thomas was engaged in continuous drug dealing during 2007 and thus that these additional drug quantities were part of the same course of conduct as the offenses of conviction. *See Farmer*, 543 F.3d at 373; *United States v. Panaigua-Verdugo*, 537 F.3d 722, 726-27 (7th Cir. 2008).

Counsel next consider whether Thomas could challenge the district court's calculation of his criminal history. Thomas was convicted in 1994 of unlawful possession of a stolen motor vehicle and sentenced to 8 years' imprisonment. Thomas challenged the inclusion of that conviction in his criminal history on the ground that it was too old, but as counsel correctly point out, any prior sentence of imprisonment exceeding one year and one month that was imposed within 15 years of the commencement of the instant offense counts towards a defendant's criminal history. *See* U.S.S.G. § 4A1.2(e)(1); *United States v. Gabel*, 85 F.3d 1217, 1222-23 (7th Cir. 1996).

Lastly, we agree with counsel that any potential challenge to the reasonableness of Thomas's total prison sentence would be frivolous. After evaluating the sentencing factors in 18 U.S.C. § 3553(a), the district court imposed total imprisonment of 300 months, slightly higher than the midpoint of the properly calculated guidelines range of 262 to 327 months. Counsel have not identified any reason to disturb the presumption of reasonableness that we would apply to this within-guidelines sentence on appeal. *See United States v. Mendoza*, 576 F.3d 711, 723 (7th Cir. 2009). Although the district court did not explicitly address Thomas's request for a sentence reduction on account of his cooperation with the government, the argument was so weak that it did not require discussion because Thomas never cooperated. *See United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009) (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). The agents initially released Thomas under an agreement to cooperate, but they promptly terminated the agreement after he lied to them about his crack source. Thomas also asked the district court to reduce his sentence because, he asserted, the seriousness of his criminal history had been overstated. But he argued only that sentences he received in 1994 and 1998 were too old to be counted, and we have already explained why that argument is frivolous. Nor did the district court err in rejecting Thomas's requests for leniency on account of sentencing manipulation or sentencing entrapment. Even assuming, as we recently did in *United States v. Knox*, 573 F.3d 441, 451-52 (7th Cir. 2009), that evidence of sentencing entrapment and manipulation may both be relevant to a district court's analysis of the § 3553(a) factors, we agree with counsel that it would be frivolous for Thomas to assert that the government abused its discretion by rejecting his requests for leniency on those grounds. As for sentencing entrapment, there was no evidence that "unrelenting government persistence" led Thomas to commit a crime he lacked a predisposition to commit. *See United States v. Turner*, 569 F.3d 637, 641 (7th Cir. 2009) (internal quotation marks and citation omitted). And, to the extent that Thomas asserted that the agents elicited information from him about his transactions with other dealers using false promises of leniency in order to later manipulate his sentence, the agents' uncontradicted testimony at trial was that Thomas offered up that information without any prompting.

That leaves Thomas's response under Circuit Rule 51(b), in which he proposes to challenge the district court's use of a special verdict to determine the amount of cocaine, but not the amount of marijuana, involved in the conspiracy. A drug conspiracy involving at least 5 kilograms of cocaine carries a sentence of 10 years' to life imprisonment, 21 U.S.C. § 841(b)(1)(A)(ii), while a conspiracy involving less than 50 kilograms of marijuana carries a maximum penalty of 5 years' imprisonment, *id.* § 841(b)(1)(D). The 40 to 120 pounds of marijuana that Johnson estimated he supplied to Thomas converts to approximately 18 to 54 kilograms. Thomas insists that, when an indictment refers to multiple drugs, a defendant "must be sentenced as if he distributed only the drug carrying the lower penalty," and thus asserts that if the jury had credited the lower end of Johnson's marijuana estimate in a special verdict, his statutory maximum prison sentence would have been five years. What Thomas misunderstands, however, is that a special verdict finding that he conspired to distribute less than 50 kilograms of marijuana would not get him off the hook for the cocaine portion of the conspiracy. Once the jury determined that he distributed more than five kilograms of cocaine—making him eligible for life imprisonment—the quantity of other drugs he distributed had no impact on his maximum sentence. *See Knox v. United States*, 400 F.3d 519, 522 (7th Cir. 2005).

Counsel's motion to withdraw is GRANTED, and the appeal is DISMISSED.