In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-2655

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KARL BULLOCK,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 895—**Samuel Der-Yeghiayan**, *Judge.*

---

ARGUED MAY 31, 2006—DECIDED JULY 18, 2006

---

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* After receiving what can best be described as a whopper of a sentence—1,200 months in a federal prison—Karl Bullock filed this appeal claiming it was unreasonable. Today, we resolve his appeal.

Bullock pleaded guilty to five counts of distributing heroin. Each count carried a maximum penalty of 20 years. 21 U.S.C. § 841(b)(1)(C). The district court imposed the maximum sentence for each of the counts, stringing them together for a total sentence of 100 years. One hundred years is a long time—one year longer, in fact, than the standard lyrical shorthand for an unimaginably long

sentence.[1] Our task, under *United States v. Booker*, 543 U.S. 220, 261 (2005), is to determine whether the sentence is nevertheless reasonable.

Bullock's arrest came at the tail end of an investigation into drug sales by members of the Gangster Disciples at the Rockwell Gardens housing project in Chicago, particularly the building at 340 S. Western Avenue. As a result of that investigation, more than two dozen people were indicted in the case of *United States v. Epps*, 02 CR 895 (N.D. Ill.). Bullock would have been indicted along with them, the government tells us, but he was arrested after most of the other defendants had already pleaded guilty. From the statements of some of those defendants, which are included in Bullock's presentence report, we learn that the Rockwell Gardens operation got off the ground in July 1999 when Richard Epps, a Gangster Disciple "Overseer," was released from prison. Given responsibility by his gang superiors for drug sales out of the 340 Building, Epps organized a thriving crack-cocaine marketplace. His

---

[1]  *See, e.g.*, Bruce Springsteen, "Johnny 99" ("Well the evidence is clear, gonna let the sentence, son, fit the crime / Prison for 98 and a year and we'll call it even, Johnny 99."); Bob Dylan, "Percy's Song" ("It may be true he's got a sentence to serve / But ninety-nine years, he just don't deserve."); Johnny Cash, "Cocaine Blues" ("The judge he smiled as he picked up his pen / Ninety-nine years in the Folsom pen / Ninety-nine years underneath that ground / I can't forget the day I shot that bad bitch down."); Ed Bruce, "Ninety-Seven More To Go" ("Ninety-nine years go so slow / When you still got ninety-seven more to go."); Bill Anderson, "Ninety-Nine" ("The picture's still in front of my eyes, the echo in my ears / When the jury said he's guilty and the judge said ninety-nine years."); Chloe Bain, "Ninety-Nine Years" ("The sentence was sharp, folks, it cut like a knife / For ninety-nine years, folks, is almost for life."); Guy Mitchell, "Ninety-Nine Years" ("Ninety-nine years in the penitentiary, baby, baby, wait for me, around twenty-fifty-five we'll get together dead or alive.").

workers typically dealt around half a kilogram of crack per week, and sometimes that much in a single day.

Bullock, too, was an Overseer in the Gangster Disciples, but he wasn't directly involved in this crack-dealing scheme. His main territory was a couple of miles to the west, in the neighborhood known as "K-Town" (where all the street names begin with "K"[2]), and his primary product line was heroin, not crack. But he knew a business opportunity when he saw it, and he noticed that the demand for heroin at Rockwell Gardens was going unmet. So in the summer of 2000, Bullock obtained permission from Epps to deal heroin out of the 340 Building, in exchange for a small licencing fee of around $600 per week. Over the next 8 weeks, with the help of at least four fellow gang members, Bullock sold somewhere around eight kilograms of heroin from this new location.

The material accompanying the presentence report is primarily devoted to the extended details of this crack/ heroin conspiracy; only a small fraction of its nearly 200 pages touch on Bullock's own involvement. The PSR also briefly mentions a series of five transactions in the summer of 2002 in which Bullock sold a total of 110 grams of heroin to a government informant in his home base of K-Town. These, then, were the six counts on which Bullock was indicted: one count of conspiring to distribute crack and heroin, and five counts of distributing heroin.

As we said, Bullock pleaded guilty to the five heroin-distribution counts. Although there was no formal plea agreement, the government agreed that it would move at sentencing to dismiss the conspiracy count. The government reserved the right to argue, however, that the entire

---

[2]  Specifically, the eight avenues between Pulaski and Cicero just north of the Eisenhower expressway:  Karlov, Keeler, Kildare, Kostner, Kilbourn, Kolmar, Kenton, and Kilpatrick.

340 Building conspiracy was relevant conduct for pur-poses of calculating Bullock's advisory sentencing guideline range. *See* U.S.S.G. § 1B1.3(a)(2). Although Bullock denied that the conspiracy was relevant conduct, the presentence report agreed with the government that the heroin sold in the course of the conspiracy should be included in the guideline analysis. But the PSR also concluded that there was no evidence that Bullock was directly involved in the sale of crack and so omitted those drug quantities from its calculation.

Despite the PSR's recommendation, the district court adopted the government's view that the entire conspiracy was relevant conduct and so held Bullock responsible not only for the 110 grams of heroin which he admitted hav-ing sold, but also the approximately 8 kilograms of heroin and the more than 1.5 kilograms of crack sold from the 340 Building during the 8 weeks of Bullock's involvement there. This made an enormous difference in the guideline calcula-tion: 110 grams of heroin corresponds to a base offense level of 26; add 8 kilograms of heroin and you're at level 34; include more than 1.5 kilograms of crack and you get to level 38. *See* § 2D1.1(c). The court added another 2 points based on evidence that Bullock routinely carried a gun while dealing, § 2D1.1(b), and another 3 points for his being a manager or supervisor in criminal activity involving five or more participants, § 3B1.1(b). The court considered granting a 2-point reduction for acceptance of responsibility, § 3E1.1(1), but decided not to when Bullock refused to acknowledge his involvement in the 340 Building conspir-acy.

That left the offense level at 43. The court calculated a criminal history category of IV, but at level 43 the criminal history category doesn't matter—the guidelines recommend life across the board. Recognizing the severity of that sentence, the government suggested the court exercise its post-*Booker* discretion to impose a lower

sentence, something on the order of 30 years. But the district judge was not feeling lenient. Stating that he had considered the various sentencing factors given at 18 U.S.C. § 3553(a), he summarized his position: "After considering all the evidence in this case, drug distribution tears into the very fabric of society and results in the death of individuals and destruction of families; and you, Mr. Bullock, have significantly contributed to that." The 1,200-month sentence followed this observation.

Bullock argues that his 100-year sentence is unreasonable. (He also argues that it violates the Eighth Amendment, but we always avoid addressing a constitutional question if we can. *See Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir. 2006).) We have said that a sentence within the properly calculated guideline range is presumptively reasonable but that because the guidelines are now trumped by the factors listed in § 3553(a), a defendant can overcome the presumption by showing that his sentence is unreasonable when measured against those factors. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Bullock makes passing reference to many of those factors but relies primarily on § 3553(a)(6), which directs the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." He points out that among the defendants who pleaded guilty in the related case of *United States v. Epps*, none received a sentence longer than 20 years, and of the three who went to trial and lost, one was given 300 months and one got 480 months.[3] In comparison, Bullock argues, his sentence of 1200 months is clearly unreasonable.

The government rightly observes that comparison with codefendants is not usually enough to establish a sentenc-

---

[3] One, however, did receive a life sentence.

ing disparity for purposes of § 3553(a)(6). As we said in *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006), "the kind of 'disparity' with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case." To some extent, however, this proves Bullock's point:  the defendants in *Epps* were party to a different case and were sentenced by a different judge, leaving open the possibility that Bullock's sentence was unduly affected by the vagaries of judicial assignment. And although Bullock hasn't explicitly compared his sentence with those received by comparably situated defendants nationwide, *see United States v. Newsom*, 428 F.3d 685, 689 (7th Cir. 2005), our own experience confirms that in the federal courts, where defendants actually spend some 86 percent of their time behind bars, a sentence of 100 years is quite unusual.

Our doubts about the reasonableness of Bullock's sentence are reinforced when we consider how the court arrived at his sentencing range:  by including as relevant conduct both the heroin and the cocaine sold out of the 340 Building in the summer of 2000. In order to qualify as relevant conduct, drug sales other than the offense of conviction must be found to be "part of the same course of conduct or common scheme or plan as the offense of conviction." *See* § 1B1.3(a)(2); *United States v. Johnson*, 324 F.3d 875, 878-79 (7th Cir. 2003). Although § 1B1.3 cmt. n.9 provides broad definitions of "same course of conduct" and "common scheme or plan," we have emphasized that in order to fall within either definition, it is not enough that both offenses involve the sale of drugs. *See United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996) ("The mere fact that the defendant has engaged in other drug transactions is not sufficient to justify treating those transactions as 'relevant conduct' for sentencing purposes."); *United States v. Duarte*, 950 F.2d 1255, (vacating sentence based on aggregating uncharged drug quantities where "[t]here is little, if anything, to

suggest a temporal, geographical or any other relationship" with the offense of conviction).

In this case, Bullock pleaded guilty to five counts of selling heroin. Those sales took place in K-Town in the summer of 2002, two miles away from the 340 Building and two years after Bullock's alleged involvement with the conspiracy there. Although the PSR treats Bullock's earlier heroin sales as part of the same course of conduct or common scheme or plan as the later controlled purchases, the connection is not self-evident. We have been wary of treating as relevant conduct drug sales that took place that far back in time. *See United States v. Palmer*, 248 F.3d 569, 571 (7th Cir. 2001) (per curiam) (vacating sentence based in part on uncharged drug sales that were "remote in time—over 2 years old—to the sales . . . that form the basis for the counts of conviction"); *United States v. Ruiz*, 178 F.3d 877, 882 (7th Cir. 1999) ("Where the gap in time [between drug transactions] is as long as the two years in this case, 'we must be cautious and exacting in permitting such relatively stale dealings to be included in the same course of conduct as the offense of conviction.'") (quoting *United States v. Cedano-Rojas*, 999 F.2d 1175, 1180 (7th Cir. 1993)); *Johnson*, 324 F.3d at 879. ("While lapse of time between the two offenses is not in itself dispositive of the question of relevance, it does suggest the separate character of the two episodes.") (citation omitted). It may yet be possible to justify treating the earlier heroin sales as relevant conduct chargeable to Bullock, but the reason needs to be set out explicitly, not simply assumed. *See United States v. Sumner*, 265 F.3d 532, 539-40 (7th Cir. 2001) ("[W]hen a court relies entirely on the PSR to make its relevant conduct finding, the PSR must explain how the purported relevant conduct is part of the same course of conduct or common scheme or plan as the offense of conviction."); *Crockett*, 82 F.3d at 730 ("To ensure that only relevant conduct is included in calculating the sentence, the

government must carefully present the justification for the inclusion of any uncharged acts and the court must, in turn, set out its reasoning as clearly as possible.").

As for the crack component of the 340 Building conspiracy, it appears even more tenuously related to Bullock's offense of conviction. As justification for treating the crack sales as relevant conduct, the government offered and the court accepted the theory that Bullock's heroin sales out of the 340 Building benefitted from the security and other organizational infrastructure that was already in place there, thanks to the efforts of Richard Epps and his colleagues. But at most, this makes Epps's crack trade relevant conduct with respect to Bullock's heroin sales from the 340 Building. It doesn't make it relevant to Bullock's actual offense of conviction—selling heroin five times in K-Town in 2002. That is, it's relevant only by association with other relevant conduct, through a kind of criminal transitivity. That's not good enough—the connection to the offense of conviction has to be direct. *See United States v. Pinnock*, 47 F.3d 434, 439 (D.C. Cir. 1995) ("[T]he government must demonstrate a connection between count three [offered as relevant conduct] and the *offense of conviction*, not between count three and the other offenses offered as relevant conduct.") (emphasis in original). We doubt that any such connection can be shown with respect to the more than 1.5 kilograms of crack the court used in calculating Bullock's guideline range.

At the most, Bullock is responsible for somewhere in the vicinity of 8 kilograms of heroin (and we emphasize, it remains for the district court to support such a finding on the basis of the record), which would give him a base offense level of 34 and a maximum enhanced offense level of 39. With a criminal history category of IV, his recommended sentencing range would then be 360 months to life. We also note that Bullock was denied acceptance-of-responsibility points because he refused to admit involvement with

Epps's conspiracy. But if that conspiracy is not in fact relevant conduct, Bullock's refusal to admit involvement in it cannot be considered falsely denying or frivolously contesting relevant conduct. *See* U.S.S.G. § 3E1.1 cmt. n.1(a). He would therefore be entitled to at least a 2-point reduction, bringing his recommended range down to 292 to 365 months.

These questions concerning relevant conduct need to be resolved in the district court, and the court must then decide how to exercise its discretion under *Booker* relative to a properly calculated guideline range. As we said in *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006), "[w]hen a judge does not properly calculate a guidelines sentence, our review for reasonableness is forestalled." For these reasons, we VACATE Bullock's sentence and REMAND for resentencing. Because we also conclude that it would be best to have a new judge take a fresh look at the case, Circuit Rule 36 shall apply on remand.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*