# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-1835 & 12-1947

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MAURICE D. VAUGHN and
MAURICE C. LOCKHART,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 11 CR 90—**William M. Conley**, *Chief Judge.*

ARGUED APRIL 12, 2013—DECIDED JULY 3, 2013

Before BAUER, POSNER, and FLAUM, *Circuit Judges*.

FLAUM, *Circuit Judge*. In August 2010, Maurice Vaughn and Maurice Lockhart were indicted for conspiring to distribute more than 100 grams of heroin in violation of 21 U.S.C. §§ 841(a) and 846. Lockhart worked for Vaughn as one of Vaughn's two heroin distributors in Beloit, Wisconsin and sold small bags of heroin to buyers who arranged purchases through Vaughn. Before trial,

Lockhart moved to dismiss the indictment and requested a bill of particulars. The district court denied his motions. Maintaining their innocence, the defendants proceeded to trial on January 23, 2012, and a jury convicted them of the crimes charged, largely on the basis of circumstantial evidence. The district court then sentenced Vaughn to 240 months in prison and sentenced Lockhart to 72 months in prison. Both defendants appeal. Lockhart contends that the district court erred in denying his motion to dismiss the indictment and his motion for a bill of particulars. Separately, Vaughn argues that there was insufficient evidence presented at trial to support the jury's verdict and that the district court erred in imposing his 240-month sentence. For the reasons set forth below, we affirm.

## I. Background

### A. Factual Background

For three months during the summer of 2010, Vaughn served as the leader of a heroin distribution conspiracy in Beloit, Wisconsin. Several tips from heroin users led police to one of Vaughn's distributors who, after being arrested with seventy small bags of heroin on his person, signed a plea agreement and agreed to testify against Vaughn and Lockhart.

#### 1. Maurice Vaughn

Beloit police began investigating Vaughn for drug trafficking in 2007. In June of that year, when Vaughn

was on federal supervised release for a cocaine distribution conviction, a confidential informant attempted to purchase two grams of heroin from Vaughn as part of a controlled buy. The informant wore a wire, got into Vaughn's car, and handed over $250 for the arranged purchase. Before exchanging the drugs, however, Vaughn checked the informant for a wire. When he located the recording device on the informant's body, Vaughn ripped it off, kicked the informant out of the car, and tossed the money out of his car window as he drove away.

During the same period of time in 2007, Vaughn was also distributing heroin to Jesse Green. Green told investigators that from the beginning of 2007 to September 2007, he bought between three and five grams of heroin from Vaughn each day for his own use and for sale.

In late 2007 or early 2008, Patrick Riley began using heroin he obtained from Vaughn, whom Riley had met when the two worked together for the same employer. Riley estimated that from 2008 through mid-2010, he received gram quantities of uncut heroin from Vaughn. Generally, Riley would purchase the heroin from Vaughn directly, but once Vaughn began using Carlos Ford as a distributor in 2010, Ford would make deliveries to Riley only after Riley had first contacted Vaughn to arrange a purchase.

### 2. The Distributors

Ford worked as a distributor for Vaughn from December 2009 through March 2010. Each day, Vaughn

would supply Ford with heroin to sell in exchange for personal-use quantities or cash. For a short time in the spring of 2010, Ford and Vaughn had a falling out in response to customer complaints about the purity of the product, but after their dispute, they quickly resumed their supplier/distributor relationship. At that point, however, Vaughn assumed more control over Ford's heroin sales. Rather than going directly to Ford, as they had in the past, the customers were required to contact Vaughn first and Vaughn would direct them on where and when to meet Ford. Following a customer request, Vaughn would contact Ford by cell phone and tell him where to meet the buyer.

Ford testified that each morning during the summer of 2010, he picked up approximately fifty to seventy small bags containing pre-weighed heroin (also referred to as bindles or "dime bags") from Vaughn along with the cell phone that enabled Vaughn to contact Ford and give him directions after a call from a customer. Upon the completion of his daily shift, Vaughn instructed Ford to drop off money from the day's sales and any remaining heroin to Vaughn or to Lockhart. During that summer, Lockhart served in the same role as Ford and distributed heroin in front of his house in Beloit.

Vaughn's customers knew that he ran a two-shift arrangement. If they wanted heroin during the day, Vaughn directed them to meet with Ford for delivery. If customers ordered heroin in the afternoon or evening, Vaughn would instruct them to meet with Lockhart.

Prior to his dealings with Vaughn, Ford did not know Lockhart. And although Ford had been obtaining heroin from Vaughn and selling it as early as December 2009, Lockhart did not become involved until the spring of 2010, the point at which Vaughn began exercising more direct control over the distribution.

### 3. Ford's Arrest and the Subsequent Indictments

On August 11, 2010, an officer conducted a traffic stop after observing Ford driving erratically in Beloit. During the course of that stop, officers searched Ford's person and located a key chain containing two bags of heroin. Immediately following his arrest, officers observed Ford moving around in the back seat of the squad car as if he were attempting to conceal an item behind him. Shortly thereafter, a strip search at the jail revealed seventy bindles containing a total of 11.621 grams of heroin between Ford's buttocks. Ford later testified that the seventy bags of heroin in his possession at the time of his arrest was the daily supply he had just picked up from Vaughn. After weighing the contents of the bags, Detective Andre Sayles estimated that each package contained 0.13 gram of heroin.

Six days after Ford's arrest, a grand jury in the Western District of Wisconsin returned a one-count indictment against Vaughn and Lockhart for conspiring with each other, Ford, and others to distribute 100 grams or more of heroin from May 2010 to August 10, 2010 in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. Officers arrested Lockhart on August 29, 2011 and Vaughn

on October 10, 2011 without recovering any physical evidence. Both defendants pleaded not guilty to the charged offense.

## B. Procedural Background

Before trial, Lockhart moved to dismiss the indictment as impermissibly vague, urging the district court to adopt civil pleading standards in ruling on his motion. Lockhart also requested a bill of particulars. The district court denied both motions and the case proceeded to trial.

### 1. Trial Testimony

During the trial, several witnesses testified to their interactions with and knowledge of Vaughn and Lockhart, corroborating Ford's description of the heroin distribution arrangement. The defendants' customers also testified to the amount of heroin they obtained from Lockhart and Ford.

#### a. Casie Kast

Casie Kast, Ford's girlfriend, testified that during the summer of 2010, she would drive Ford to a house in Beloit where Ford would pick up the day's supply of heroin from Vaughn. Kast saw the daily supply of heroin and, as a heroin user herself, had used some of the heroin each day. Kast also confirmed that Ford would receive cell phone calls from Vaughn, instructing Ford on when and where to meet customers that had arranged a pur-

chase. At the end of Ford's shift on approximately fifteen to twenty occasions, Kast explained that she drove Ford to Lockhart's house on Dewey Street so that he could drop off the money from the heroin sales and pass the cell phone along to either Vaughn or Lockhart.

### b. Ashley Titus, Darrell Jackson, and Andre Simms

Ashley Titus and Darrell Jackson also testified at trial. Both admitted to using heroin in the summer of 2010 and explained that they would contact an intermediary, Andre Simms, for the purchase of heroin. In their presence, Simms would make a phone call, and Titus and Jackson would then drive Simms to either of two typical locations where the person on the phone had directed him. Titus and Jackson would watch as Simms met with one of two distributors, who Titus and Jackson identified as Ford and Lockhart.

Simms confirmed Titus's and Jackson's testimony about the heroin deals he middled involving purchases from Ford and Lockhart. Simms also corroborated Ford's account of the manner in which heroin purchases from Ford changed during the summer of 2010, requiring Simms to call Vaughn to set up a purchase. When Simms called Vaughn, he would tell Vaughn that he wanted to purchase heroin, and Vaughn would then instruct Simms to meet with either Ford or Lockhart at a specified location.

### c. Lawrence McShan

Like Simms, Lawrence McShan served as an intermediary for heroin users in order to support his own heroin habit. McShan testified that in the summer of 2010, he would pick up heroin from Ford or Lockhart after calling a designated number to arrange a purchase. The person McShan called would direct him to meet with Ford during the morning hours and to meet with Lockhart during the evening hours. On one occasion when McShan met with Ford, McShan did not have enough money to cover his purchase. McShan recalled that Ford told him, "You can't be short man. You gonna have to talk to Reese about this." McShan testified that he knew "Reese" to be Maurice Vaughn.

### d. Crystal Freeman

Crystal Freeman, who used McShan as an intermediary, identified both Lockhart and Ford as heroin distributors. She explained that she had watched McShan meet with Lockhart in front of his home on numerous occasions, and although she did not know his name, she recognized Lockhart from prior contact she had with him at her former place of employment in Beloit. Freeman testified that on other occasions, McShan would call someone on his cell phone before going to meet Ford. She estimated that McShan met with Ford to purchase heroin for her approximately thirty to forty times during the summer of 2010, and testified that she observed McShan meet with Lockhart to get heroin "every day" that summer. Finally, Freeman confirmed the different shifts

during which Ford and Lockhart sold the drugs: Ford sold during the morning, and Lockhart sold in the afternoon and evening.

### e. Seized Heroin

During the trial, the government showed each of the customer witnesses the bags of heroin seized from Ford at the time of his arrest in August 2010. Kast, Jackson, Simms, and Freeman identified those bags as representative of the bags they had seen used when purchasing heroin through either Ford or Lockhart. Customers who bought multiple times in a single day and who therefore ended up buying from both Ford and Lockhart testified that the packaging in which they received the heroin was the same in the morning and the evening.

The witnesses also testified to the number of bags and the frequency with which they purchased heroin from Ford and Lockhart during the summer of 2010. The government used the samples seized from Ford as a reference for the average weight of each bag. Detective Sayles, who had seized the seventy bags of heroin from Ford after his arrest, testified to his estimate that each small package contained an average of 0.13 gram of heroin.

### 2. Jury Verdict

When the government rested its case, both defendants moved to dismiss, alleging a failure to prove their involvement in the charged conspiracy beyond a rea-

sonable doubt. The court denied the motions and after the conclusion of the trial, the jury found both defendants guilty and made a special finding that the conspiracy involved 100 grams or more of heroin. Neither defendant submitted a post-verdict motion or a request for a new trial.

### 3. Sentencing

The probation office filed Vaughn's Presentence Investigation Report ("PSR") on March 5, 2012. The PSR noted that the crime lab had determined that the heroin seized from Ford actually weighed a total of 11.621 grams, resulting in an average weight per bag of 0.166 gram. Vaughn did not object to this calculation.

The PSR also outlined the frequency and bindle number estimates attributed to each witness who admitted to purchasing heroin from Ford and Lockhart. The PSR multiplied the estimated number of bags obtained by each witness by the 0.13 gram weight estimate to which Detective Sayles testified at trial unless the particular witness's testimony differed from the typical bag. The calculation, when added to the relevant-conduct weight estimates for Vaughn, resulted in a total drug weight of 1,568.65 grams of heroin.

The probation officer's calculation of the relevant drug quantities together with a two-level enhancement for Vaughn's role in the conspiracy as a leader or organizer resulted in a 235- to 293-month range for sentencing. Lockhart's guidelines range for sentencing was 108 to

135 months, based in part on his much less substantial criminal history. On March 29, 2012, the district court sentenced Vaughn to 240 months' imprisonment and on April 12, 2012, the court sentenced Lockhart to 72 months' imprisonment. Both defendants appealed.

## III. Discussion

On appeal, Lockhart contends that the indictment charging the heroin distribution conspiracy in this case provided insufficient factual allegations to support the charge. He maintains that the district court erred in denying his motion to dismiss the indictment and his motion for a bill of particulars. Separately, Vaughn challenges his conviction, arguing that there was insufficient evidence offered at trial to support the jury's verdict. Vaughn also disputes his guidelines calculation for sentencing and contends that the court erred in computing the relevant drug weight, calculating his criminal history score, and applying a two-level enhancement for his role as a leader or organizer of the conspiracy. Finally, Vaughn argues that the sentence imposed by the district court is substantively unreasonable.

### A. The District Court Properly Denied Lockhart's Motion to Dismiss the Indictment.

Pursuant to a defendant's right to be informed of the charges against him and his right to be free from conviction without notice and without having meaningful opportunity to defend, Federal Rule of Criminal Pro-

cedure 7(c)(1) provides that an "indictment or information must [include] a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). In line with this directive, we have held that an indictment is legally sufficient if it (1) states all the elements of the crime charged, (2) adequately informs the defendant of the nature of the charges against him, and (3) allows the defendant to assert the judgment as a bar to future prosecutions of the same offense. *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). We have further explained that an indictment "that 'tracks' the words of a statute to state the elements of the crime is generally acceptable, and while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007) (explaining that an indictment "parroting the language of a federal criminal statute" is sufficient so long as the crime is not one that must be charged with greater specificity).

To successfully challenge the sufficiency of an indictment, a defendant must demonstrate that the indictment did not satisfy one or more of the required elements and that he suffered prejudice from the alleged deficiency. *United States v. Dooley*, 578 F.3d 582, 589-90 (7th Cir. 2009). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Hausman*, 345 F.3d 952, 955 (7th

Cir. 2003) (internal quotation marks omitted). We review de novo a defendant's challenge to the sufficiency of an indictment. *Smith*, 230 F.3d at 305.

On August 17, 2010, a grand jury in the Western District of Wisconsin issued an indictment charging Vaughn and Lockhart as follows:

> From in or about May 2010 until on or about August 10, 2010, in the Western District of Wisconsin, the defendants, Maurice D. Vaughn and Maurice C. Lockhart, knowingly and intentionally conspired and agreed with each other and with Carlos Ford, named as a co-conspirator but not a defendant herein, and with other persons known and unknown to the grand jury, to distribute heroin, a Schedule I controlled substance, with this offense involving 100 grams or more of a mixture or substance containing heroin, in violation of Title 21, United States Code, Section 841(a)(1). (All in violation of Title 21, United States Code, Section 846).

Dkt. 1. This court has consistently held that an indictment charging an offense under 21 U.S.C. §§ 841(a) and 846, which are the statutes the defendants were charged with violating in this case, fulfills the requirements of Rule 7(c)(1) and of the constitution "if it sets forth the existence of a drug conspiracy, the operative time of the conspiracy, and the statute violated." *United States v. Singleton*, 588 F.3d 497, 499-500 (7th Cir. 2009). The indictment here contains each of the required elements and was sufficient to notify Lockhart of what the government intended to prove. Although it does not allege facts

addressing any particular drug transactions, our cases do not require such specificity.[1]

To avoid our established precedent on this issue, which plainly supports the sufficiency of the indictment in this case, Lockhart urges this court to adopt the civil pleading standards articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to assess the sufficiency of a criminal indictment. No court has taken this approach, and we decline Lockhart's invitation to do so here. Importantly, the Supreme Court's decisions in *Twombly* and *Iqbal* ushered in a requirement that civil pleadings demonstrate some merit or plausibility in complaint allegations to protect defendants from having to undergo costly discovery unless a substantial case is brought against them. *See Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 802-03 (7th Cir. 2008). We do not believe that the concerns guiding the Court's approach in the civil context apply with equal force in the case of a criminal indictment, and if a defendant has serious apprehension about his ability to prepare a defense in light of the charges against him, he can seek a bill of particulars. Here, the criminal indictment meets

---

[1] The indictment at issue in *Singleton*, a case in which we affirmed the district court's denial of the defendant's motion to dismiss the indictment, conforms to a nearly identical structure as and presents substantially similar language to the indictment charging the defendants in this case. *See United States v. Singleton*, No. 07-CR-524-3, 2008 WL 4853419, at *1 (N.D. Ill. Nov. 3, 2008).

the requirements outlined by the Supreme Court in *Resendiz-Ponce*, and we decline to stray from that approach without a change in course undertaken by the Court itself. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (directing courts of appeals to leave to the Supreme Court "the prerogative of overruling its own decisions").

## B. The District Court Did Not Abuse its Discretion in Denying Lockhart's Motion for a Bill of Particulars.

Lockhart next argues that the district court erred in denying his motion for a bill of particulars—a written statement providing the defendant with detailed information concerning the charges against him. We review the district court's decision to deny such a motion under a deferential standard and will reverse only upon a showing that the court abused its discretion and that the defendant suffered prejudice as a result. *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008).

This court's bill-of-particulars analysis is similar to its constitutional sufficiency-of-the-indictment analysis; "in both cases, the key question is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial preparation." *Id*. Indeed, we have previously explained that a bill of particulars is "unnecessary where the indictment sets forth the elements of the charged offenses and provides sufficient notice of the charges to enable the defendant to prepare his defense." *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003); *see also United States v. Kendall*, 665 F.2d

126, 135 (7th Cir. 1981) ("[A] defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." (internal quotation marks omitted)). And as discussed above, an indictment that includes each of the elements of the charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the applicable statute or statutes is sufficient to meet that standard. *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003).

Lockhart moved for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) at the time he sought dismissal of the indictment. In that motion, he asked that the government:

1. Identify all acts (including time, date, place and persons present) committed by Mr. Lockhart which support the charged conspiracy.

2. Identify all acts (including time, date, place and persons present) committed by Mr. Lockhart's co-defendants which the government believes supported, aided or abetted in his illegal activity, or are otherwise attributable to Mr. Lockhart.

3. Identify the dates or approximate dates when Mr. Lockhart is alleged to have joined the conspiracy and dates he left the conspiracy.

4. Identify what Mr. Lockhart agreed to do as a member of the conspiracy.

Dkt. 24 at 2. In his brief in support of his motion in the district court, Lockhart argued that the bill of particulars

would help him better understand his role in the charged offense. He explained that the government found no heroin in his possession at any time and never attempted to purchase heroin from him through the use of a confidential informant.

In support of his argument that the district court erred in denying his request for a bill of particulars, Lockhart cites a District of D.C. case in which the court determined that the less stringent pleading requirements for a narcotics conspiracy charged under § 846 increase the need for a bill of particulars in such a case. *See United States v. Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C. 1999). The court in *Ramirez* reasoned that because a charged defendant has very little information about the actual events supporting the charge, he should be given additional information to allow him to prepare adequately for trial. *Id.* Of course, we recognize the importance of ensuring that a defendant has sufficient information about his charges to allow him to prepare an adequate defense, but we have also explained that a bill of particulars is unnecessary if the information the defendant seeks is readily available through alternate means such as discovery. *Blanchard*, 542 F.3d at 1140; *see also United States v. Redd*, 167 F. App'x 565, 568 (7th Cir. 2006) (holding that a defendant was not entitled to a bill of particulars where the indictment charging a violation of § 841(a) included an allegation of conspiracy, the time period in which the conspiracy operated, and the statute violated and where the defendant had access to more detailed information through discovery).

Here, before Lockhart moved for a bill of particulars in the district court, the government produced over 350 pages of discovery, including investigative and surveillance reports and numerous reports of interviews with witnesses who were involved in transactions with the conspirators. We agree with the district court that a 350-page production detailing witness statements and other surveillance activities is adequate to satisfy the need for a bill of particulars without being so voluminous that it places an unreasonable burden on the defendant. But even if the information relevant to Lockhart's defense was not available to him through discovery, Lockhart did not attempt to show that the denial of the bill of particulars resulted in actual prejudice, which is an element we require for reversal. *See Hernandez*, 330 F.3d at 975. Having found no error in the district court's resolution of Lockhart's pretrial motions, we affirm his conviction in this case.

## C. Vaughn's Conviction is Supported by Sufficient Evidence in the Record.

We turn now to Lockhart's co-defendant. In appealing his conviction, Vaughn contends that the government failed to prove the existence of a conspiracy beyond a reasonable doubt. He argues that the government, at best, demonstrated merely a buyer-seller relationship between Vaughn, Lockhart, and Ford. Ordinarily, a conviction may be reversed on appeal only where the record, viewed in the light most favorable to the government, is "devoid of evidence from which a reasonable

jury could find guilt beyond a reasonable doubt." *United States v. Durham*, 645 F.3d 883, 892 (7th Cir. 2011). But where, as here, a defendant does not move for a judgment of acquittal in the district court, "the even more stringent plain-error standard applies." *Id.* "Under this most demanding standard," a defendant will "prevail only if he can show that, absent reversal, a manifest miscarriage of justice will result." *United States v. Beaver*, 515 F.3d 730, 741-42 (7th Cir. 2008) (internal quotation marks omitted).

### 1. Requirements for Proof of a Conspiracy

To convict a defendant on a conspiracy charge, the government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement. *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). Specifically, a drug-distribution conspiracy charged under 21 U.S.C. §846 "requires proof that the defendant knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs." *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). This court has repeatedly explained that a conspiracy does not exist where a drug purchaser resells to his own customers drugs he obtained from a supplier. *Id.*; *United States v. Colon*, 549 F.3d 565, 567 (7th Cir. 2008). Instead, a conspiracy "requires evidence that the buyer and seller entered into an agreement to commit a crime other than the crime that consists of the sale itself." *Johnson*, 592 F.3d at 754 (internal quotation marks omitted).

Because certain characteristics inherent in a buyer-seller relationship may also suggest the existence of a conspiracy, we have recognized that it is difficult to determine what evidence is sufficient to establish an agreement to distribute drugs. *Id.* For example, the sale of large quantities of drugs, standardized transactions, and a sustained relationship between the parties may demonstrate either a buyer-seller relationship or a conspiracy to distribute. *Id.* at 754-55. Consequently, we require the government to "offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *Id.* at 755. For example, the government may prove the conspiratorial agreement through evidence of sales on credit or consignment, an agreement to seek out additional customers, commission payments, one party providing advice for the other's business, or an agreement to warn of potential threats to each other's business. *United States v. Villasenor*, 664 F.3d 673, 680 (7th Cir. 2011); *see also Colon*, 549 F.3d at 568-70. To be sure, "not all credit sales can support an inference that there was an agreement to distribute." *United States v. Vallar*, 635 F.3d 271, 287 (7th Cir. 2011) (internal quotation marks omitted). But when a credit sale is combined "with certain characteristics inherent in an ongoing wholesale buyer-seller relationship—i.e., large quantities of drugs, repeat purchases or some other enduring arrangement—the credit sale becomes sufficient evidence to distinguish a conspiracy from a nonconspiratorial buyer-seller relationship." *Id.*

### 2. Evidence of an Agreement to Distribute

Here, when considered in the light most favorable to the government, the evidence in the record demonstrates that the government successfully distinguished Vaughn's conspiratorial relationship with his co-defendants from a nonconspiratorial buyer-seller affiliation. Ford testified at trial that he picked up between fifty and seventy pre-packaged bags of heroin and a cell phone from Vaughn each day during the summer of 2010 and that he sold those bags to customers who called Vaughn to set up deals. At the end of his shift, Ford would turn over the money from the sales and any leftover heroin to either Lockhart or Vaughn, and Lockhart would sell heroin in the afternoon. In exchange for selling the heroin, Ford testified that he received either heroin for his personal use, cash, or both. During his testimony, Ford also explained that Vaughn wanted to exercise control over his heroin sales because of earlier complaints about the quality of the product. Other witnesses corroborated Ford's description of the two-shift arrangement and Vaughn's command over the drug sales, including Ford's girlfriend, who often drove Ford to pick up the heroin and to drop off the proceeds and the cell phone at Lockhart's house.

Vaughn seemingly recognizes that Ford's testimony implicates him in a conspiracy, but contends that Ford was not a credible witness and that his testimony was influenced by a desire to reduce his own sentence. He suggests that the jury could not have given any credit to Ford's testimony or to that of his girlfriend, which

he argues was tainted by her desire to have Ford serve a shorter sentence. But in determining whether the evidence in the record supports the jury's verdict, this court's task is not to "weigh the evidence" or "to second-guess the trier of fact." *United States v. Smith*, 576 F.3d 681, 686 (7th Cir. 2009) (internal quotation marks omitted). While jurors have an "opportunity to observe the verbal and nonverbal behavior of the witnesses," this court may look only to the cold appellate record. *Id.* at 687. We have therefore adopted a clearly erroneous standard with respect to credibility determinations; a jury's conclusions on credibility will be set aside "only if [it] has chosen to credit exceedingly improbable testimony," meaning that the testimony is "internally inconsistent" or "implausible on its face." *Id.* (internal quotation marks omitted).

True, Ford is a convicted felon and heroin user who agreed to testified against Vaughn as a part of his plea agreement. Kast, his girlfriend, was granted immunity. And several of the witnesses who corroborated the structure of the transactions testified under the impression that they would not be prosecuted for their testimony. But each witness faced cross-examination concerning their own charges, prior convictions, plea agreements, immunity, and bias, giving the jury an opportunity to assess each witness's testimony in light of those facts. Notwithstanding this cross-examination and the defense's arguments in closing relating to the witness's motives, the jury apparently accepted the testimony as credible, a determination we do not find to be clearly

erroneous. Ford's testimony unquestionably supports the finding of an agreement to distribute heroin and is neither internally inconsistent nor facially implausible. Accordingly, we conclude that there was sufficient evidence in the record to support Vaughn's conviction for conspiracy to distribute heroin.

## D. The District Court Properly Calculated Vaughn's Guidelines Range for Sentencing.

For the first time on appeal, Vaughn challenges three aspects of his sentencing guidelines determination. First, he argues that the district court made incorrect findings as to the drug amounts that were part of the same course of conduct as the charged offense. Second, he contends that the district court miscalculated his criminal history. And finally, he asserts that the district court improperly applied a two-level enhancement for acting as a leader or organizer in the conspiracy. We review a district court's application of the sentencing guidelines de novo and its factual findings for clear error. *United States v. Turner*, 400 F.3d 491, 500 (7th Cir. 2005). When no objection to the guidelines calculation is made at trial, however, we review the calculation for plain error. *United States v. Jumah*, 599 F.3d 799, 811 (7th Cir. 2010). Here, because we find no error affecting Vaughn's substantial rights in the district court's determination of the appropriate guidelines range for sentencing, we affirm the sentence imposed. *See id.*

## 1. Drug Weight Calculation

During Vaughn's sentencing hearing, the district court adopted the probation officer's guidelines calculation in the PSR and explicitly stated that the calculation "takes into consideration the defendant's relevant conduct according to Section 1B1.3." Vaughn argues that in calculating the relevant drug weight applicable to his base offense level, the district court erred by considering drug transactions that were not a part of the conspiracy and that were too far removed from the conspiracy to be considered relevant conduct. Moreover, Vaughn contends that the district court double counted a portion of the relevant drug weight by attributing to two individuals heroin that the individuals shared.

### a. Relevant Conduct

Section 1B1.3 of the guidelines instructs district courts to compute sentences based on quantities of distributed drugs that were not accounted for in the actual conviction but that were "part of the same course of conduct or common scheme or plan" as the convicted offense. *United States v. Arroyo*, 406 F.3d 881, 888 (7th Cir. 2005) (quoting U.S.S.G. § 1B1.3(a)(2)). This "relevant conduct" rule allows district courts to consider additional quantities of drugs not specified in the conviction on the condition that "the unconvicted activities bore the necessary relation to the convicted offense." *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998) (internal quotation marks omitted). According to the guidelines, two or more offenses are part of a common scheme or plan if they are

"substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 cmt. n.9. Offenses that do not meet the requirements of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* When a court relies solely on the PSR to make its relevant conduct finding, the PSR must explain how the earlier distribution activities were a part of the same course of conduct or common scheme as the offense of conviction. *United States v. Sumner*, 265 F.3d 532, 539-40 (7th Cir. 2001).

On the basis of statements made by individuals who had purchased heroin from Vaughn, the probation officer included in Vaughn's drug weight calculation amounts of heroin that he sold before the conspiracy began, dating back to beginning of 2007. The relevant pre-conspiracy amounts are reflected in the top portion of the following chart:

**Drug Amounts Attributable to Vaughn
as Stated in the PSR**

*Pre-Conspiracy Relevant Conduct Amounts*

| | |
|---|---|
| Errin Meding (Dec. 23, 2009) | 11.1 grams of heroin |
| Valerie Crenshaw (Dec. 16, 2009) | 0.5 gram of heroin |

| | |
|---|---|
| Andre Shelley (Dec. 2009 through April 22, 2010) | 3 grams of heroin |
| Pat Riley (Late 2007/Early 2008 through Mid-2010) | 215 grams of heroin |
| Jesse Green (Beginning of 2007 through Sept. 2007) | 729 grams of heroin |

*Amounts Included in the Conviction*

| | |
|---|---|
| Pat Riley (included in the conspiracy) | 53 grams of heroin |
| Crystal Freeman (included in the conspiracy) | 31.85 grams of heroin |
| Andre Simms (included in the conspiracy) | 23.4 grams of heroin |
| Carlos Ford (included in the conspiracy)[2] | 455 grams of heroin |
| Darrell Jackson (included in the conspiracy) | 46.8 grams of heroin |
| **Total Amount Attributable to Vaughn** | 1,568.65 grams of heroin |

---

[2] Because the drug amounts attributed to Ford are included in the total calculation, the amounts the other purchasers received from Ford were not included in the drug weight calculation. Instead, only the heroin the purchasers obtained through Lockhart was considered in the overall calculation. It appears from the PSR that some of the 53 grams Pat Riley purchased during the course of the conspiracy may have been purchased from Ford, but Vaughn did not raise an objection to this particular calculation in either the district court or on appeal.

Dkt. 40 at 14. In addition to listing the estimated purchase amounts, the PSR included a short summary of the statements from each individual who admitted to purchasing heroin from either Vaughn or Lockhart, including statements from Jesse Green who bought heroin from Vaughn in 2007, three years before the initiation of the charged conspiracy. Vaughn argues that the district court erred in relying on these statements when it accepted the PSR's relevant conduct finding because the statements were not admitted at trial and the individuals were not subject to cross-examination.

That the PSR relied on statements not offered during Vaughn's sentencing hearing or during his trial is of no consequence. *See United States v. Wilson*, 502 F.3d 718, 722 (7th Cir. 2007). "Reliable drug quantity evidence need not come directly from sworn witnesses" as Vaughn suggests. *Id.* The evidence may also come from the PSR so long as the report itself is based on reliable witness statements. *Id.* And Vaughn offers no support for his assertion that Green's statement to law enforcement was "presumptively unreliable as it was given with government involvement, it described events from three years prior and Vaughn never had an opportunity to test it via cross-examination or otherwise."[3] Appellant Br. at 34.

However, we must proceed with caution when assessing the nature of relevant conduct occurring long

---

[3] Vaughn also argued that "the trial court did not make findings of the trustworthiness of Meding, Crenshaw or Shelly's statements." Appellant Br. at 35.

before a charged conspiracy. *See, e.g.*, *United States v. McGowan*, 478 F.3d 800, 802 (7th Cir. 2007); *United State v. Bullock*, 454 F.3d 637, 642 (7th Cir. 2006). We have previously noted that long gaps of time between a conspiracy and other drug sales can "cast doubt on the relevance of the earlier conduct." *McGowan*, 478 F.3d at 802. But amounts from earlier drug sales may still be included in a defendant's overall drug weight for sentencing if the government makes a sufficient showing on the other course-of-conduct factors. *See id.*

Indeed, Vaughn's sales to Green, which added 729 grams of heroin to his overall drug weight calculation (moving his base offense level from 30 to 32), occurred between January 2007 and September 2007, nearly three years prior to the formation of the charged conspiracy. But unlike a case in which a defendant engaged in no apparent drug activity between a charged offense and an uncharged drug offense two years earlier, *see, e.g.*, *Bullock*, 454 F.3d at 642, the evidence summarized in Vaughn's PSR places Vaughn repeatedly selling gram quantities of heroin to at least one individual in Beloit from the beginning of 2007 until the end of the conspiracy in 2010 with little, if any, interruption. When a substantial period of time exists between drug offenses without any intervening activity, it is possible to conclude that the defendant put his criminal activity on hold during that period of time. But where a defendant sells drugs, albeit to different purchasers, for an extended period of time with little or no break leading up to the charged offense, it is much more likely that the

sales are part of the same common scheme or plan as the offense of conviction. Thus, while Vaughn's sales to Green in 2007 were nearly three years removed from the charged conspiracy, the sales came on the heels of Vaughn's distribution to Riley in late 2007 or early 2008, which continued into the time of the conspiracy. In light of the statements supporting the continuity of Vaughn's heroin distribution in the PSR, we conclude that the district court did not plainly err when it accepted the probation officer's relevant conduct determination. *See United States v. Acosta*, 85 F.3d 275, 280 (7th Cir. 1996) ("[W]here it is clear from the record that the district court considered and adopted the facts recited in the presentence report, as well as the government's reasoning concerning the significance of those facts in establishing the defendant's responsibility for uncharged conduct, we have upheld the court's decision to treat the uncharged activities as relevant conduct despite the lack of an express finding that the activities were part of 'the same course of conduct' or 'common scheme or plan' as the convicted offense.").

### b. Double Counting

In challenging the district court's drug weight calculation, Vaughn also argues that the district court double counted the heroin attributed to Vaughn through sales to Jackson and Simms. The relevant testimony at trial indicated that Jackson and Titus would contact Simms, an intermediary, for the purchase of heroin. Simms would make a phone call in their presence and the three

would then travel to a specified location to pick up the heroin. Jackson testified that during the summer of 2010, he obtained heroin from Lockhart, through Simms, thirty to sixty times. In exchange for the money Jackson and Titus gave Simms for the purchases, Simms would obtain twelve bags of heroin. Simms would then keep one or two of the bags as payment, and Jackson and Titus would divide the remaining bags for their own personal use. Although Simms testified that he orchestrated at least one heroin purchase for Aaron Thompson on July 14, 2010 and stated that he received heroin twice a day for approximately a month supplied by either Ford or Lockhart, he did not indicate the specific quantity of heroin he received from Lockhart each day or whether the quantity reflected the heroin he received in exchange for brokering the purchases for Jackson and Titus. Moreover, Thompson's statements to authorities revealed only that Simms middled deals between Thompson and Ford, not between Thompson and Lockhart.

Based on this information, the PSR calculated the amounts attributable to Vaughn through Jackson and Simms as follows:

- Jackson: "(Approximately 30 occasions x 12 bags x 0.13 gram of heroin = 46.8 grams of heroin received from Lockhart). On a number of occasions Jackson purchased heroin from Simms who received it from Carlos Ford. (This amount is not included in the calculations to avoid double counting as it is included in Ford's drug calculations.)" Dkt. 40 at 12.

- Simms: "The drug quantities he received from Ford are included in Ford's drug amounts and are not included in the calculations to avoid double counting. Simms received approximately a total of 23.4 grams directly from Lockhart. (30 days x 6 bags x .13 gram of heroin = 23.4 grams of heroin)." Dkt. 40 at 9.

The PSR did not include the heroin Titus divided with Jackson, apparently because every bag of heroin the pair obtained through Simms was included in Jackson's calculation.[4]

Although we believe that the PSR properly calculated Jackson's drug quantities, even if those quantities included the heroin Jackson ultimately divided with Titus or gave to Simms as payment, it is less clear where the probation officer found support for the *additional* 23.4 grams of heroin that the PSR attributed to Simms as purchases from Lockhart. The PSR indicates that Simms testified he received heroin twice a day for approximately a month from either "Ford or . . . Lockhart," but the PSR does not state how much heroin Simms received each day or whether the heroin he received from Lockhart is the same as the "one or two bags of heroin" Simms would keep after brokering a deal for Jackson and Titus. This detail is

---

[4] Vaughn argues that the PSR did not make clear the fact that Jackson's totals included the bags he shared with Titus. But while the PSR did not include an explicit statement regarding the breakdown, the overall calculation did not include any amounts for Titus.

important because although Jackson testified that Simms would keep one or two of the twelve bags he received from Lockhart, Jackson's drug weight calculation included all twelve bags.

But ultimately, the inclusion of the amounts attributed to Simms in the PSR, if an error, was harmless. The drug quantity the district court used to formulate Vaughn's base offense level, which amounted to 1,568.65 grams of heroin, far exceeds the one kilogram of heroin required to reach the base offense level of 32, even when the 23.4 grams of heroin attributed to Simms in the PSR are subtracted from that calculation. We therefore find no plain error in the court's calculation of Vaughn's base offense level because of the inclusion of the heroin attributed to Simms.

### c. Average Weight

In one last attempt to dispute the district court's calculation of the relevant drug weight, Vaughn contends that the court improperly relied on the 0.13 gram-per-bindle calculation completed by the detective who seized the seventy bags of heroin from Ford on the day of his arrest. Vaughn suggests that a more appropriate estimate, as Lockhart put forth in his sentencing memorandum, would have been a measure of 0.09 grams per bindle. Prior to his sentencing, Lockhart submitted a report prepared by a chemistry student obtaining a PhD at UW-Madison who had visually compared packages of a similar substance and speculated that it would have

been possible for the packages to contain 0.09 gram of heroin, which would change the total weight figures.

In contrast to the PhD student, the testifying detective physically weighed the bindles of heroin he seized from Ford. He weighed all of the bindles together and then weighed one of the empty bags. The detective multiplied the weight of the single, empty bag by seventy and then subtracted that number from the overall weight of the bags and the heroin combined to arrive at an average weight of 0.13 gram of heroin per bindle. Moreover, the PSR noted that the crime lab had actually determined the weight of the heroin in the seventy bags seized from Ford to be 11.621 grams, yielding an average weight of 0.166 gram per bag, but it ultimately used the detective's more conservative estimate to calculate the relevant drug weight.

The district court accepted the PSR's calculation of the average weight per bindle during Vaughn's sentencing hearing on March 29, 2012, before Lockhart submitted the report offering the alternative 0.09 gram figure.[5] Because the 0.13 gram per bindle calculation is supported by reliable information in the PSR, we find no error in the district court's acceptance of that estimate. And having determined that the district court committed no prejudicial error in identifying the relevant drug quantities or approving the average drug weight, we affirm the calculation of Vaughn's base offense level for sentencing.

---

[5] Lockhart submitted the report to the district court on April 12, 2012.

### 2. Criminal History Calculation

Vaughn turns next to the district court's calculation of his relevant criminal history. He contends that but for the court's consideration of the heroin sales to Green in 2007 as relevant conduct, the district court could not have included a 1998 conviction for unlawful possession of a controlled substance and a two-point increase for committing the instant offense while under supervised release. U.S.S.G. § 4A1.2(e)(1) (specifying that "[a]ny prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense" and "any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense" should be counted when computing the defendant's criminal history); U.S.S.G. § 4A1.1(d) (directing the addition of two points "if the defendant committed the instant offense while under . . . supervised release"); *see also* U.S.S.G. § 4A1.2 comment n.8 (defining the "commencement of the instant offense," as including any relevant conduct considered under § 1B1.3). Having already determined that the district court committed no plain error by including the 2007 drug sales as relevant conduct, we agree with the district court's calculation of Vaughn's criminal history points. The prior conviction at issue was imposed by an Illinois court within ten years of the 2007 conduct, and Vaughn was on supervised release until August 1, 2008 for a more recent offense.

### 3.  Application of the Leader/Organizer Enhancement

Vaughn's final argument with respect to the district court's calculation of his guidelines range pertains to the court's application of a two-level leader or organizer enhancement. Section 3B1.1(c) of the sentencing guidelines provides that a defendant's offense level should be increased by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). Vaughn contends that in his case, the application of the enhancement was improper because the facts presented at trial demonstrated no more than a buyer-seller relationship or alternatively, because he played the lesser role of bringing the parties together. Vaughn argues, as he did in challenging his conviction, that the record is devoid of any evidence corroborating Ford's and Kast's testimony placing Vaughn in the leadership role.

In determining whether a defendant acted as an organizer, leader, manager, or supervisor, we have held that courts may consider the factors outlined in Application Note 4 to § 3B1.1(c), including the degree of control and authority the defendant exercised over others. *See United States v. Weaver*, No. 12-3324, 2013 WL 2402851, *3 (7th Cir. June 3, 2013) (allowing but not requiring courts to reference the factors in Application Note 4 to the extent they "help to straighforwardly identify whether a defendant helps manage or supervise a criminal scheme" (inter-

nal quotation marks omitted)).[6] There may be cases in which a court need not consider those factors in order to conclude that the defendant was a leader or manager, but here, the factor addressing control and authority is instructive. *See id.* The evidence at trial showed that Vaughn supplied Ford with heroin to sell each day during the conspiracy and exercised direct, ongoing control over Ford's sales by requiring customers to contact him before purchasing from Ford. Only when Vaughn called Ford on the cell phone Vaughn provided would Ford be informed of when and where to meet a purchaser to distribute the pre-packaged, sealed bags of heroin. At the end of each shift, Ford testified that he returned the cell phone and the proceeds to either Vaughn or Lockhart so that Lockhart could continue selling into the afternoon and evening. This arrangement is distinct from one in which a supplier merely fronts drugs to distributors; Vaughn told Ford what to do and determined whether he had done it. *See United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012). And although Vaughn again urges this court to discredit Ford's and his girlfriend's testimony, we refuse to re-weigh the evidence presented to the jury or independently assess each witness's credibility. The jury accepted Ford's testimony, which clearly established Vaughn's supervisory role, and the district court appro-

---

[6] In *Weaver*, we explained that "[a]lthough Note 4 offered these factors to distinguish *between* organizer/leaders and managers/supervisors, we have, in the past, consulted these factors to decide whether Guideline 3B1.1 applies in the first place." *Weaver*, 2013 WL 2402851 at *3 (emphasis in original).

priately applied the two-level enhancement. Together with Vaughn's base offense level and his criminal history, the district court properly determined Vaughn's guidelines range for sentencing to be 235 to 293 months.

### E. Vaughn's Within-Guidelines Sentence is Substantively Reasonable.

After hearing argument from the parties and considering the relevant sentencing documents, the district court imposed a sentence of 240 months' imprisonment. Although sentences within or below a correctly-calculated guidelines range are presumed reasonable, *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009), Vaughn contends that the district court committed procedural error by not properly considering the factors outlined in 18 U.S.C. § 3553(a) and that it ultimately imposed a substantively unreasonable sentence. This court reviews de novo whether the sentencing court committed a procedural error, but considers the substantive reasonableness of the sentence for an abuse of discretion in light of the factors in § 3553(a). *United States v. Annoreno*, 713 F.3d 352, 357 (7th Cir. 2013).

A sentencing court is not required to comprehensively discuss each of the factors listed in 18 U.S.C. § 3553(a) and explicitly formulate a conclusion with respect to each one. *United States v. Vizcarra*, 668 F.3d 516, 527 (7th Cir. 2012). Instead, "sentencing judges must only demonstrate meaningful consideration of [the] § 3553(a) factors." *United States v. Paige*, 611 F.3d 397, 398 (7th Cir. 2010). And "we regularly affirm sentences where the district judge does

not explicitly mention each argument raised by the defendant." *Id.*

Before imposing Vaughn's sentence, the district court addressed the seriousness of the offense and Vaughn's history and characteristics. The judge explained that Vaughn's relevant conduct involved a conservative estimate of 1.57 kilograms of heroin, an extremely addictive substance, and noted that Vaughn's previous terms of imprisonment had not deterred him from committing additional crimes. Although Vaughn had been laid off from his job at a GM parts distributor in the fall of 2008, the judge explained that his drug activity could not be traced back to that event because Vaughn began selling heroin while he was still employed. Given the nature of the offense and Vaughn's personal history and characteristics, the judge determined that a custodial sentence of twenty years would be reasonable and no greater than necessary to satisfy the statutory purposes of sentencing.

With respect to the court's consideration of the § 3553(a) factors, Vaughn essentially argues that the district court gave insufficient weight to facts that may have counseled in favor of a lower sentence, such as his desire to act as a father to his step daughters and biological son. This court has explained, however, that "it is perfectly acceptable for courts to assign varying weights to the factors as they deem appropriate in the context of each case." *United States v. Busara*, 551 F.3d 669, 674 (7th Cir. 2008). Because the district court adequately considered the statutory sentencing factors and provided a compre-

hensive explanation for the sentence imposed, it committed no procedural error. *See United States v. Ashqar*, 582 F.3d 819, 826-27 (7th Cir. 2009).

In addition to contesting the procedural aspects of his sentencing, Vaughn argues that his sentence is substantively unreasonable in light of the lesser, seventy-two-month sentence Lockhart received for his role in the conspiracy. True, § 3553(a)(6) requires judges to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). But the fact that the district court imposed a lesser sentence on Vaughn's co-defendant does not mean that Vaughn's sentence is therefore unreasonable. *United States v. Hill*, 683 F.3d 867, 871 (7th Cir. 2012). Vaughn's criminal history points put him in criminal history category V, whereas Lockhart fell within category II. Moreover, Lockhart's need for rehabilitation and deterrence was much less pronounced than Vaughn's. And although Vaughn suggests that he played a lesser role in the conspiracy, the court properly imposed a two-level enhancement for his role as a leader, an enhancement that was not applicable to Lockhart. These distinctions resulted in considerably different guidelines ranges, and the sentencing disparity between them was warranted. Accordingly, we conclude that Vaughn has not overcome the presumption of reasonableness attached to his within-guidelines sentence.

### III. Conclusion

For these reasons, we AFFIRM Lockhart's conviction, AFFIRM Vaughn's conviction, and AFFIRM Vaughn's 240-month sentence.